## IN RE SHANNON S. ET AL.[*]

SUPERIOR COURT
JUVENILE MATTERS

BARNETT, J. By petitions filed on September 18, 1987, the commissioner of the department of children and youth services (DCYS) seeks to terminate the parental rights of Georgiann and Jacob S. in and to their children Shannon and Jacob, Jr., aged four and two and the parental rights of Georgiann S. in and to her child Louis T. aged eleven. The father of Louis T. is deceased. The three petitions have been brought pursuant to General Statutes § 17-43a, whereby the court has jurisdiction with respect to any child previously committed to DCYS in accordance with General Statutes § 46b-129 (d). Shannon, Jacob, Jr., and Louis were found to be uncared for on September 3, 1986, and were committed to DCYS on October 16, 1986. Each of the petitions alleges the existence for a period of not less than one year of all four grounds permitted for the nonconsensual termination of parental rights by General Statutes § 17-43a (b).

[*] Thus entitled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 1058.

I

Before proceeding to the merits of the DCYS allegations, mention should be made of the structure of cases of this nature. A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book §§ 1042, 1044, 1049. The two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in these cases, is permissible. *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 259, 471 A.2d 1380 (1984).

Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged in each of the three petitions and, hence, is limited to events preceding the filing date of September 18, 1987. The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to that phase, the court is entitled to extend its consideration to matters occurring until the end of the trial which, in these cases, was January 28, 1988. *In re Juvenile Appeal (84-AB)*, supra, 267 and 267-68 n.14. The dispositive phase is not reached unless the grounds alleged in the adjudicatory phase are proven. On each of the three petitions, the existence of at least one of the statutory grounds for termination must be proved by clear and convincing evidence. General Statutes § 17-43a (b); *In re Migdalia M.*, 6 Conn. App. 194, 208, 504 A.2d 532, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

II

At the trial, the court received testimony from Joseph Donroe, the DCYS social worker; Lorraine M., the foster mother of Louis; Nancy G., the foster mother of Shannon and Jacob, Jr.; and Anthony Campagna, a licensed clinical psychologist who performed court-

ordered evaluations on November 10, 13 and 20, 1987. Campagna's report was placed in evidence as an exhibit as was the mandated social study prepared by Donroe. Although Campagna's examinations occurred after the petitions were filed, the substance of his evaluations were relevant, in many respects, to the adjudicatory issues.

Georgiann did not appear for the trial which was conducted on January 5, 13 and 28, 1988, but she had actual notice of its starting date. At that time, she resided in Maryland. In a telephone conversation with Lorraine M. on January 3, 1988, Georgiann said that she would not appear unless someone came to get her. On all dates of the trial, Jacob was confined to the New Haven Community Correctional Center. His appearance was assured by the issuance of habeas corpus writs. Jacob declined to testify. Practice Book § 1046 (2); see General Statutes § 46b-135 (b). Both parents were represented by the same appointed counsel.

From the testimonial and documentary evidence, the court finds the facts set forth below to be material and relevant to the adjudicatory phase of the three petitions. The number of grounds and the involvement of three children, however, require some further findings of fact that appear in later portions of this memorandum.

The marriage of Georgiann and Jacob has been marked by periods of instability, depression, and alcohol and substance abuse. All three children were already in foster care when the agreed upon uncared-for adjudications were entered on September 3, 1986. Louis was placed on November 12, 1985, at Georgiann's request. His present foster home with Lorraine M. is his third placement. Shannon and Jacob, Jr., were placed on February 21, 1986, when Georgiann and Jacob turned to DCYS for help when they were evicted

from their apartment due to nonpayment of rent. At the commitment hearing on October 3, 1986, neither parent appeared. Notice of their acquiescence to the commitments came from their appointed counsel.

Because Georgiann and Jacob were absent from the commitment hearing, the court was unable to utilize the normal procedure for the setting of expectations. In lieu thereof, the court announced that the parents were to contact DCYS to arrange a service agreement and that the service agreement was to be submitted for the court's approval by November 16, 1986.

A service agreement of three months duration was not executed until February 11, 1987, and was between only Georgiann and DCYS. When the agreement was signed, Jacob was incarcerated in the New Haven Community Correctional Center and had been since December, 1986. DCYS was informed of Jacob's confinement by Georgiann in February, 1987. Pursuant to the terms of the agreement, Georgiann was (1) to find appropriate housing for herself and the children, (2) to obtain counseling for herself, (3) to maintain weekly telephone contact with the children, (4) to visit with the children every two weeks with DCYS assistance, and (5) to maintain contact with DCYS.

During the existence of the service agreement, Georgiann failed to comply with any of its provisions. She made one visit, on February 17, 1987, to the foster home in Old Lyme where Shannon and Jacob, Jr., resided. On that visit, Louis, Jr., was present, having been brought from his foster home in Naugatuck by Donroe. Georgiann visited Louis one additional time at his foster home on March 3, 1987. In 1987, no telephone calls were made by Georgiann to Shannon and Jacob, Jr., and the pattern of her telephone calls to Louis was erratic. After signing the service agreement, Georgiann announced that she would not participate

in counseling and rejected Donroe's offer to make arrangements with the Hamden Mental Health Association. Georgiann made no observable effort to obtain housing. Donroe's suggestions of agencies and organizations that might assist her were ignored. Instead, Georgiann continued to live in the homes of various friends and then moved to Maryland. Georgiann did not keep in contact with DCYS. Donroe learned of her Maryland address only because it was on a card she had sent to Louis.

Between the expiration of the service agreement on May 11, 1987, and the filing of the petitions on September 18, 1987, Georgiann's conduct remained unchanged. There were no further visits with Shannon and Jacob, Jr., and no letters, cards or telephone calls were received at their foster home. Georgiann was dissatisfied with the results of her first visit. Jacob, Jr., did not remember her and Shannon said that she did not want to leave the foster home. Contact was maintained with Louis through infrequent telephone calls, a Christmas card and one letter. There was no contact between Georgiann and DCYS.

Of the two parents of Shannon and Jacob, Jr., Georgiann was the more active one in dealing with DCYS. Jacob, as well as Georgiann, however, were present at a meeting with Donroe in August, 1986, shortly before the agreed upon uncared-for adjudications. The meeting occurred on the porch of a house on Wolcott Street in New Haven where Georgiann and Jacob, being homeless, were boarding temporarily. At the meeting, Donroe said they would have to get together to discuss visitation and other matters. Conferences and meetings were subsequently scheduled but neither parent appeared and Donroe's efforts to locate them were unsuccessful.

In 1986, Jacob made one telephone call on his own to the foster home of Shannon and Jacob, Jr., and three calls in conjunction with Georgiann. No further attempts to communicate with his children were made by Jacob until May, 1987, when his counselor at the correctional center called DCYS and stated that Jacob wanted to know how the children were doing. After visiting with Jacob, Donroe, with the approval of his supervisor, decided against visits by the children at the correctional center. The reason given for the decision was that the jail setting would be overly traumatic and especially so in view of the fact that Jacob had not visited with the children prior to being incarcerated. Later, in August, 1987, Jacob began sending letters to his children, Shannon and Jacob, Jr., and also to Georgiann's son, Louis.

### III

Clear and convincing evidence, the required standard of proof in termination actions, has been described in both quantitative and qualitative terms. For example, clear and convincing evidence has been defined as a level of persuasion lying between the usual civil requirement of proof by a fair preponderance of the evidence and the requirement in criminal cases of proof beyond a reasonable doubt. *Cookson* v. *Cookson,* 201 Conn. 229, 234, 514 A.2d 323 (1986). Another and more qualitative definition is that clear and convincing evidence is proof sufficient to satisfy a court beyond an average certainty. *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 468, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). In the three petitions at issue, as previously noted, DCYS has asserted the existence of the four grounds permitted by § 17-43a (b) as causes for termination of parental rights.

### A

Abandonment, the first ground asserted by DCYS, is defined by § 17-43a (b) (1) as a parent's failure "to

maintain a reasonable degree of interest, concern or responsibility as to the welfare of [his or her] child . . . ." The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently must be proved. See, e.g., *Litvaitis* v. *Litvaitis,* 162 Conn. 540, 547, 295 A.2d 519 (1972); *Kantor* v. *Bloom,* 90 Conn. 210, 213, 96 A. 974 (1916).

Recently, the Appellate Court discussed statutory abandonment in the context of parental responsibilities as set forth in an earlier decision of the Supreme Court. *In re Rayna M.,* 13 Conn. App. 23, 36–37, 534 A.2d 897 (1987). The Supreme Court, in *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 15, 438 A.2d 801 (1981), stated that the commonly understood obligations of parenthood entailed the following minimum attributes: " '(1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.' "

The extent to which specific parents should be held to the performance of all or some of the above stated obligations depends in large part on the particulars of a given case. In characterizing statutory abandonment, the Supreme Court has emphasized that the focus is on the parent's conduct and that the question is one of fact to be resolved by the trial court in the light of relevant circumstances. *In re Juvenile Appeal (Docket No. 9489),* supra, 14. Consideration must be given to the status of Georgiann and Jacob as noncustodial parents of Shannon and Jacob, Jr., since February 21, 1986, and to Georgiann's status as the noncustodial par-

ent of Louis since November 12, 1985. Consideration must be given also to the facts of Georgiann's residency in Maryland and Jacob's incarceration.

The court finds from clear and convincing evidence that Georgiann's abandonment of the three children has been proved. From the dates when she became a noncustodial parent, she visited with Louis three times and with Shannon and Jacob, Jr., only once. Her record of telephone calls and her writings to Louis, which under some circumstances could be considered as expressions of interest, concern or responsibility; see *In re Migdalia M.*, supra, 209; were too infrequent to rebut the otherwise convincing proof that she had abdicated her parental responsibilities.

Although the move to Maryland made performance of the postcommitment service agreement, and contact in general with the children more difficult, Georgiann's decision to leave Connecticut was never shown to have been prompted by some proper motive such as an opportunity for employment or proximity to family. Nothing was known about Georgiann's life in Maryland except that she used the surname "Wallace" and that her sister had informed Donroe that Georgiann had spent some time in jail in Maryland.

The verb "maintain," as used in § 17-43a (b) (1), contemplates that a parent will continue to have a reasonable degree of interest in the welfare of his or her children. Id., 210. Georgiann's conduct which, at best, can be described as sporadic displays of interest in her children fell far beneath the statutory standard. *In re Rayna M.*, supra, 37.

The abandonment of Shannon and Jacob, Jr., by Jacob also has been established clearly and convincingly. From February 21, 1986, the date of placement, until sometime in December, 1986, when Jacob was

incarcerated, his efforts to maintain contact with his children, independently of Georgiann, were limited to one telephone call.

Jacob's imprisonment hardly complicates the issue. The incarceration of a parent does not alone constitute abandonment. *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 443, 446 A.2d 808 (1982); *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 711, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children. *In re Juvenile Appeal (Docket No. 10155)*, supra. After Jacob went to jail, the first expression of interest by him in Shannon and Jacob, Jr., was the call from his counselor five months later in May, 1987. Donroe visited Jacob in the same month. Jacob's letter writing, however, did not start until August, 1987, the month preceding the filing of the petition.

### B

The second ground asserted for termination is that after the uncared-for adjudications on September 3, 1986, the parents "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age[s] and needs of the child[ren], they could assume a reasonable position in the [lives of their children] . . . ." General Statutes § 17-43a (b) (2). The phrase " 'personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent.' " *In re Rayna M.*, supra, 32; *In re Migdalia M.*, supra, 203. As with the prior claim of abandonment, the question of whether there was a failure to rehabilitate must be decided separately for Georgiann and Jacob.

In *In re Shavoughn K.,* 13 Conn. App. 91, 98, 534 A.2d 1243 (1987), cert. denied, 207 Conn. 805, 540 A.2d 374 (1988), the Appellate Court stated unequivocally that in deciding whether a parent has failed to achieve rehabilitation to the extent that a responsible role could be assumed in a child's life, the trial court must consider the six factors listed in General Statutes § 17-43a (d). Apart from the six factors, however, are other and more basic considerations. As presently written, the statutory ground for termination provided by a parent's failure to rehabilitate with its emphasis on "a reasonable time" and "the age and needs of the child" came into existence as a result of amendments to § 17-43a (b) (2) effective October 1, 1983. *In re Rayna M.,* supra, 32. Formerly, § 17-43a (b) (2) set no particular time as to when a parent had to be able to hold a responsible position in the child's life. See *In re Migdalia M.,* supra, 199. The general effect of the legislative changes is a shortening of the time period in which a parent's rehabilitation may be achieved. See *In re Rayna M.,* supra, 31–32.

What is a reasonable time is invariably a question of fact to be governed by attendant circumstances. *Conte* v. *Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 122, 374 A.2d 144 (1976). On the question of time periods, however, the present cases present a situation that is different from many. It was when the children were voluntarily placed in foster care prior to commitment that both Georgiann and Jacob effectively withdrew from any responsible participation in the children's lives. In the period of not less than one year from the uncared-for adjudications to the present petitions, the pattern of parental abstention or inactivity continued. Georgiann's failure to abide by the terms of the post-commitment service agreement, while in itself not synonymous with a failure to achieve personal rehabilitation; see *In re Migdalia M.,* supra, 206; is,

under the circumstances, cogent evidence of an unwillingness or inability to change the situation. Similarly, Jacob's incarceration is an item for assessment in the total picture. The present imprisonment is not the first one for Jacob and he has been through numerous social programs. Another definition of "rehabilitate" is the restoration of a person to a useful and constructive position in society through social rehabilitation. *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).

The age and needs of a child present another factbound question. From Campagna's testimony and report, the court finds that all three children need permanency in planning if not more. Although Campagna's conclusions were derived from his evaluations in November, 1987, such evidence can be used circumstantially to determine what the situation was approximately two months earlier when the petitions were filed. *Hennessey* v. *Hennessey,* 145 Conn. 211, 214–15, 140 A.2d 473 (1958). Louis clings to hopes that things will work out despite a protracted situation that he is powerless to correct. Jacob, Jr., had no recollection of Georgiann as his mother when he last saw her on February 17, 1987, and no rememberance of Jacob as his father at the interaction session that was conducted at the correctional center on November 20, 1987. Both Jacob, Jr., and Shannon have accepted their foster mother as their psychological parent.

Pursuant to the holding of *In re Shavoughn K.,* supra, the court's findings on the six factors as of September 18, 1987 when the petitions were filed are as follows.

(1) DCYS offered Georgiann advice and counseling in attempts to secure her compliance with the provisions of the postcommitment service agreement entered into on February 11, 1987. The stated purpose of the service agreement was reunification of the

family. The provisions of the agreement were designed to effectuate its purpose.

(2) The service agreement of February 11, 1987, was executed as a result of a court order. As heretofore detailed, Georgiann failed to comply with the terms of the agreement.

(3) The feelings and emotional ties of Shannon and Jacob, Jr., are directed to Nancy G, their foster mother with whom they have lived since February 21, 1986. The feelings and emotional ties of Louis are directed to his mother, Georgiann.

(4) The ages of the children were Louis, eleven, Shannon, four, and Jacob, two.

(5) Georgiann has not seen Shannon and Jacob, Jr., since February 17, 1987, and has had no communication with the two younger children since that date. When the petitions were filed, Georgiann had not seen Louis since March 3, 1987. She has communicated with him since by infrequent telephone calls, one card and one letter. From the time of Louis' voluntary placement on November 12, 1985, to the filing date of the present petitions on September 18, 1987, Georgiann has visited with him only three times. Before Jacob was incarcerated, he never visited at the foster home of Shannon and Jacob, Jr. He made one telephone call to their foster home. In the month before the petitions were filed, Jacob started to write to his children and to his wife's son, Louis, as well. Under the circumstances, Jacob's belated efforts at communication are not changes in circumstances that would make it possible to return the children to him in the foreseeable future.

(6) As of the filing date of the petitions, Georgiann was not prevented from maintaining meaningful contact with the children by anyone. In May, 1987, Jacob expressed an interest in having the children visit him at the correctional center. Donroe told Jacob that visits in the jail would not be allowed. Donroe, however, did

not tell Jacob that his decision was subject to administrative review. On a totality of the evidence, including Campagna's observations at the interaction session on November 20, 1987, the court concludes that even if visits had occurred, a meaningful relationship between Jacob and the children would not have been effected.

With respect to the second ground asserted for termination, the court finds that when the petitions were filed Georgiann and Jacob had not achieved a degree of personal rehabilitation as would encourage a belief that either of them could assume a responsible position in the children's lives. On the second ground, the court would characterize the level of proof as more than clear and convincing. In point of fact, the evidence was overwhelming.

C

On the third ground asserted for termination, the statutory requirements are that, by reason of an act or acts of parental commission or omission, a child has been denied the care, custody or control necessary for her or his physical, educational, moral or emotional well-being. General Statutes § 17-43a (b) (3). In the brief of DCYS, the claims of proof on this ground are the same acts of parental omission that supported the contentions of abandonment and failure to rehabilitate.

The same evidence certainly can establish more than one ground for termination. When the petitions were filed, however, Louis had been in foster care for almost twenty-two months and the two younger children had lived in their foster home for nineteen months. No showing by clear and convincing evidence was made that the children's well-being, in any of the four ways specified by § 17-43a (b) (3), was affected by the established acts of parental omission. Accordingly, the third ground was not proved.

## D

An absence of an ongoing parent-child relationship, the fourth ground asserted by DCYS, has a two-pronged test as is evident from the language of General Statutes § 17-43a (b) (4). Clear and convincing evidence must demonstrate the absence of a relationship "that ordinarily develops as a result of a parent having met on a day to day basis, the physical, emotional, moral and educational needs of the child . . . ." Clear and convincing evidence must demonstrate also that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to best interest of the child."

If the statutory language were to be taken at face value, the first prong with its "day to day" criteria would rarely, if ever, be satisfied by a noncustodial parent. *In re Luke G.,* 40 Conn. Sup. 316, 324–25, 498 A.2d 1054 (1985). Judicial construction of the first prong, however, has turned the question of the existence of a parent-child relationship into something that is quite different.

An absence of a parent-child relationship contemplates situations where a child has never known her or his parents so that no relationship ever developed between them or where the child has definitely lost that relationship so that despite its former existence it now has been completely displaced. *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 645, 436 A.2d 290 (1980); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 670, 420 A.2d 875 (1979). As initially stated in decisional law, proof of a lost or displaced relationship depended upon whether the child had present memories or feelings for the natural parent. *In re Juvenile Appeal (Anonymous),* supra, 181 Conn. 646; *In re Juvenile Appeal (Anonymous),* supra, 177 Conn. 670. Later deci-

sions have narrowed the initial test. At the present time, the terms "memories of" and "feelings for" refer to specific memories and positive feelings. *In re Rayna M.*, supra, 34–35; *In re James T.*, 9 Conn. App. 608, 616, 520 A.2d 644 (1987); *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985).

DCYS suggests that although Louis is bonded to his mother, their relationship, as determined by Campagna, is troubled and for that reason Louis has no positive feelings for Georgiann. The court cannot accept that analysis. From Campagna's report, it is evident that Louis hopes for a resolution that will reunite him with his mother. The existence of positive feelings depend upon the viewpoint of the child. See *In re Rayna M.*, supra, 35; *In re Juvenile Appeal (84-6)*, supra.

A problematic situation exists as to Shannon who acknowledges her natural parents but has consistently expressed a preference for living with "Mommy Nancy," her foster mother. The only evidence regarding Shannon's memories of what life was like before placement was her statement to Nancy G. that her hair was pulled and not braided. Donroe testified that after the visit of February 17, 1987, Georgiann stated that Shannon was like a stranger to her. Somewhat contradictory to this assessment were Shannon's inquiries about Jacob in her interview with Campagna and at the interaction session in November, 1987. Shannon was the child who wanted to know how long Jacob would be locked up. In Campagna's opinion, Shannon and Jacob, Jr., regard Nancy G., who attends to their daily needs, as their psychological parent.

On the basis of the ambiguous nature of the evidence, the court does not think that DCYS has met its burden to establish clearly and convincingly that Shannon did not have positive feelings for the parents or that

the parent-child relationship had been completely displaced. Consequently, with respect to Shannon, the court must hold that an absence of the parent-child relationship was not proved.

Regarding Jacob, Jr., however, the evidence was clear and convincing that, at the visit on Febuary 17, 1987, he had no memory of Georgiann as his mother. When the child was taken to the correctional center on November 20, 1987, he had no recognition of Jacob as his father and actively avoided contact with Jacob. For the youngest child, the parent-child relationship was proved to have been completely displaced. On the petition for Jacob, Jr., therefore, the court must decide the second prong of § 17-43a (b) (4).

For the second prong, the determining factor is the child's best interest. *In re Juvenile Appeal (Anonymous),* supra, 181 Conn. 646. The court is required to look to the future and determine whether it would be detrimental to the child's best interest to allow additional time for a parent-child relationship to develop. *In re Juvenile Appeal (84-6),* supra, 708. Like all other adjudicatory decisions, however, the sources for the court's prediction must be the facts existing on the filing date of the petition. *In re Juvenile Appeal (84-AB),* supra, 257, 267–68 n.14.

The salient facts furnished clear and convincing evidence that a further delay in the hope that a parent-child relationship might develop would be contrary to the best interest of Jacob, Jr. The child's development has been moderately delayed due to formative years in an unstable home. The mother has withdrawn totally from the child's life and there is no evidence on which to base a prediction as to when, if ever, she would return. Even if the father were not incarcerated, the court agrees with Campagna's opinion that the father was incapable of meeting the child's needs.

## IV

Having found that grounds one and two were estalished on the petitions for Louis and Shannon, and that grounds one, two and four were established on the petition for Jacob, Jr., the court may proceed with the dispositive phases of the litigation. Proof of one or more of the statutory grounds for termination does not bring forth an order of termination as an automatic result. To warrant a destruction of the parent-child relationship, the court must also find from clear and convincing evidence that a termination of parental rights is in the best interest of the child. *In re Nicolina T.,* 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987). By the express language of § 17-43a (d), the court cannot reach this ultimate best interest conclusion until it has considered and made written findings on the six factors enumerated therein. The legislative mandate regarding the six factors differs, in two particulars, from the holding of *In re Shavoughn K.,* supra, which also necessitates consideration of the same items. First, the legislative requirement extends to the entire case rather than only to the specific adjudicatory ground of the failure of a parent to achieve personal rehabilitation. Second, the legislative requirement pertains to the dispositive phase and this includes facts which come into existence after the filing date and up to the end of the trial.

After the petitions were filed, some additional events occurred that must be considered. Georgiann had one additional visit with Louis in October, 1987. Without the approval of DCYS, she took him from his foster home to her sister's house and left him there. Louis was returned to the foster home two days later by Donroe. Louis was disappointed that he did not get to spend much time with his mother. He explained to Campagna that the reason for Georgiann's hasty departure was

that she was wanted by the police. The stay at the aunt's house had untoward results. On Louis' return, he had a black eye and was dirty and upset. A more lasting effect was a decline in his grades at school.

Jacob continued to write letters to the three children. Jacob, Jr., does not understand the letters. Shannon has expressed no interest in answering them. Louis writes letters to Jacob but never mails them. Instead, Louis throws his letters in the trash or shoves them into the drawers of his dresser.

Set forth below are the court's written findings on the six factors as of January 28, 1988, the date on which the trial was finished. Some of the findings are extensions of those stated earlier in part III B.

(1) After Georgiann failed to comply with the service agreement and moved to Maryland, DCYS did not offer her any further services. DCYS offered no services to Jacob who was still incarcerated when the trial ended.

(2) The unfulfilled service agreement was executed as a result of a court order. The one additional court order concerned the psychological evaluations by Campagna. Georgiann failed to keep the appointment that was scheduled for her. Jacob's interview and the parent-child interaction session were conducted at the correctional center.

(3) The feelings and emotional ties of Shannon and Jacob, Jr., were still directed to Nancy G. their foster mother. Louis' feelings and emotional ties have remained directed to Georgiann.

(4) When the trial ended, Louis was eleven years old, Shannon almost five and Jacob three.

(5) Georgiann's situation with the two younger children remained unchanged. She has not seen Shannon and Jacob, Jr., since February 17, 1987, and has had no contact with them since that date. Georgiann had one additional visit with Louis in October, 1987, when

she brought him to her sister's house and left him there. Jacob continued to write to the children from the correctional center. His letters have not been answered.

(6) As of the end of the trial, no one had prevented Georgiann from maintaining a meaningful relationship with the children. Since May, 1987, Jacob has not made further inquiry about having the children visit at the correctional center. On the totality of the circumstances, the court finds that the decision of DCYS not to allow jail visits by the children was not unreasonable.

Campagna favors a termination of parental rights for the three children. Expert opinion is entitled to great weight in termination proceedings but such opinion is not a precondition for the court's own judgment as to what should be done in a child's best interest. *In re Teshea D.*, 9 Conn. App. 490, 493, 519 A.2d 1232 (1987). For Shannon and Jacob, Jr., however, the court readily agrees with Campagna that the need for termination is paramount in order to provide for permanency and with hope of adoption. The foster mother of the two younger children and her husband do not plan to adopt them and the children know of this decision.

Louis poses a much more difficult problem. Because of his ties to Georgiann, he is resistant to the idea of adoption. The attorney for the children supports termination for Shannon and Jacob, Jr., but opposes such action for Louis.

The court respects the position taken by the children's attorney but, on clear and convincing evidence, the court is in accord with Campagna's assessment. It is not in Louis' best interest to spend his childhood serving as an apologist for Georgiann as he is doing now. Nor is it in Louis' best interest to continue in his present emotionally unstable situation which has produced behavioral difficulties in foster placements and at school. A termination of Georgiann's parental rights

will provide stability for Louis in that he will be freed from his ambiguous status and will be able to enter into a long term foster relationship. Where warranted, parental rights can and should be terminated even though adoption is not contemplated. See *In re Theresa S.,* 196 Conn. 18, 30–31, 491 A.2d 355 (1985); *In re Rebecca W.,* 8 Conn. App. 92, 94–95, 510 A.2d 1017 (1986). In deciding what is best for Louis, the court has taken into account all of Georgiann's defaults including her inadequate reason for absence from the trial. See *In re Bobby Jo S.,* 10 Conn. App. 36, 41, 521 A.2d 219 (1987).

## V

A termination of the parental rights of Georgiann and Jacob S. in and to their minor children Shannon S. and Jacob S., Jr., is ordered. A *termination of the parental rights of Georgiann S. in and to her minor child* Louis T. is also ordered.

Pursuant to General Statutes § 17-43a (f), it is further ordered that the commissioner of DCYS be appointed statutory parent so that Shannon and Jacob, Jr., can be placed in adoption. The commissioner of DCYS also is appointed statutory parent for Louis so that he may be placed in adoption whenever such action becomes beneficial and feasible. DCYS is required to submit reports to the clerk of the court within ninety days of the date of this judgment every six months thereafter until the respective adoptions are finalized.