******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

APPENDIX

## IN RE AVIA M.*

Superior Court, Juvenile Matters at New Britain
File No. H14-CP16-011696-A

Memorandum filed April 3, 2018

*Proceedings*

Memorandum of decision after completed trial to court. *Judgment for petitioner.*

*Christopher N. Oakley*, for the respondent mother.

*Amy Collins*, assistant attorney general, for the petitioner.

*Lizabeth Mindera*, for the minor child.

*Opinion*

HON. STEPHEN F. FRAZZINI, JUDGE TRIAL REFEREE. Avia M., the child named above, is two years old,[1] and she needs a sober, competent caretaker and a safe and stable home. Claiming that her parents can provide her with neither, on May 2, 2017, the Commissioner of Children and Families (commissioner) filed the pending petition to terminate their parental rights (TPR) under General Statutes § 17a-112. As statutory grounds for termination, the petition alleges, pursuant to § 17a-112 (j) (3) (B) (i), that the child was previously found neglected and that both parents have failed to rehabilitate such that they can assume a responsible position in the child's life in a reasonable time. The petition also alleges, pursuant to § 17a-112 (j) (3) (E), that the child is less than seven years of age and neglected, and that the father has both failed to rehabilitate and has lost parental rights as a consequence of another TPR petition for a different child. The petition further claims that termination is in the child's best interest. Both parents appeared on the initial hearing date for the petition and, after being appointed counsel and advised of their rights, denied the allegations of the petition. Trial was then scheduled for two days in January, 2018. For the reasons discussed below, the petition is granted and the commissioner is appointed statutory parent for the child.

Trial began on January 8, 2018, and evidence continued for two more days. When the father, Antonio M., failed to appear on the first day of trial, a default was entered against him pursuant to Practice Book § 35a-8 (a).[2] The petitioner's motion to amend the petition to include additional factual allegations was thereafter granted without objection. Before evidence began, the mother, Agnieszka G., was advised in accordance with *In re Yasiel R.*, 317 Conn. 773, 794, 120 A.3d 1188 (2015). The court also granted the petitioner's motion for judicial notice and notified the parties that, pursuant to § 2-1 of the Connecticut Code of Evidence, it would take judicial notice of the contents of the court files, including memoranda of hearings and court orders, involving this child and her maternal and paternal half-siblings, except that factual assertions contained in pleadings, motions, or other documents filed by the parties would be taken as substantively true only if independent evidence thereof was introduced and found credible in this proceeding or was subject to the finality principles of res judicata or collateral estoppel.

During trial, the court heard testimony from the following witnesses:[3]

- Amber Orvis, a social worker employed by the Department of Children and Families (DCF or department) who was assigned to a child protection investigation in 2014 when the New Britain Police

Department notified DCF about domestic violence between these parents in the presence of Aaliya, Avia's older maternal half-sibling who was then nine years old, and again in 2016, when The Hospital of Central Connecticut notified DCF that Ms. G. had tested positive for cocaine and marijuana[4] at the time of Avia's birth, and who is the author of the TPR social study;

- Kristi Shooner, a DCF social worker who has supervised some of the mother's visits with the child;

- Kara Fazzolari, a DCF social worker previously assigned to the cases for Avia and Aaliya and who is the author of the addendum to the TPR social study;

- Alison Sroka, the DCF social worker currently assigned to Avia's case;

- Samantha Larkin, a residential counselor at the New Life Center (NLC), which is an inpatient mother-child substance abuse treatment program of Community Health Resources (CHR) and where Ms. G. resided between April and November of 2016;

- Lori Bergeron, a counselor at CHR's Milestone Program, an inpatient substance abuse treatment program at which Ms. G. was a patient from November 28, 2017, until she was successfully discharged from that program approximately thirty days later;[5]

- Diane Gediman, a case manager for the Supportive Housing for Families program, which is funded by DCF through a contract with The Connection and a subcontract with Wheeler Clinic and who provided housing assistance and case management services to Ms. G.;

- Daniel Millstein, a licensed clinical social worker employed by the Farrell Treatment Center (FTC), which provides treatment for substance abuse and "co-occurring disorders" and at which the mother has been a client during three periods relevant to these proceedings;

- Officer Matthew Morczko, of the New Britain Police Department, who concluded there was no probable cause for an arrest after investigating a report made by Ms. G. on August 22, 2017, that Mr. M. had accosted and injured her in her own dwelling;

- Officer Timothy Bradle of the Berlin Police Department, who arrested the mother on November 5, 2017, after finding her intoxicated and sitting in the driver's seat of a motor vehicle that had a key in the ignition and "was in someone's yard next to a basketball court"; Transcript of testimony on January 8, 2018, p. 21;

- Tina Schaffer, the director of admissions at the American Institute, a school offering vocational

medical programs and at which Ms. G. has enrolled in a program to become a Certified Nurse's Assistant.

In addition, the parties introduced the following exhibits into evidence:

- The specific steps ordered on numerous occasions for the father and mother to take in order to reunite with Avia;

- The TPR social study dated April 24, 2017, and an addendum dated December 13, 2017;

- Copy of a Memorandum of Decision in *In re Antonio S.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket No. H12-CP97-004596-A (January 16, 2009), terminating the parental rights of this respondent father with respect to the minor child in that petition brought by the Commissioner of Children and Families;

- The DCF "Investigation Protocol," with certain redactions, narrating the department's response, investigations, findings and conclusions upon being notified that the toxicology screens after Ms. G. gave birth to Avia were positive for cocaine and marijuana;

- The following records from Community Health Resources:

  - The Adult Clinical Assessment form done at the mother's admission to CHR's New Life Center on April 29, 2016;

  - A CHR "Drug/Breathalyzer Results" form dated April 30, 2016, and showing positive breathalyzer tests for cocaine and tetrahydrocannabinol (THC) for the mother upon her admission to the New Life Center on that date;

  - Excerpts from the treatment records for the mother while she attended the New Life Center;

  - The Discharge Form completed when she left the NLC on November 14, 2016;

  - The Adult Clinical Assessment form done at the mother's admission to CHR's inpatient Milestone Program on November 29, 2017;

  - Excerpts from Ms. G.'s treatment notes while she was at the Milestone Program;

  - Excerpts from the Discharge Form completed upon Ms. G.'s successful discharge from the Milestone Program;

- A copy of the DCF Form 136, Report of Suspected Child Abuse or Neglect, submitted to the department on November 7, 2016, by a residential aide at the

New Life Center after the mother returned there from a day pass on that date and "admitted to relapsing and driving under the influence with her infant daughter in the car." Petitioner's exhibit 12;

- The following records from Community Mental Health Affiliates (CMHA):

  - The Intake Assessment Form prepared when the mother entered the Adult Intensive Outpatient Program there on March 9, 2017; and

  - The Discharge Referral and Recommendations form prepared when she was discharged from that facility on May 8, 2017, "due to needing a higher level of care at this time." Petitioner's exhibit 30, p. 1;

- Excerpts from the DCF Running Narrative for January 20, 23, and 25, 2017; May 8 and 9, 2017; and June 12 and 16, 2017;

- The following records from the Farrell Treatment Center:

  - The Recovery and Treatment Plan, dated September 19, 2017, for the mother at the Farrell Treatment Center;

  - Results of drug tests performed on the mother at Quest Diagnostics on various dates in 2017 when she was a patient at the Farrell Treatment Center;

- The résumé of Daniel J. Millstein;

- The following records from The Connection, the agency that contracts with Wheeler Clinic to administer the Supportive Housing Program:

  - DCF Monthly Client Contact Reports regarding the mother's interactions in particular months with her case manager for the program between October, 2016, and February, 2017;[6] and

  - Excerpts from Client Chronological Notes between September 1, 2017, and December 2, 2018;

- Treatment records for the mother from Hartford HealthCare (HHC) when she went to HHC's Plainville facility on various occasions in 2017 and when she went to The Hospital of Central Connecticut on August 27, 2017, complaining that she had been assaulted earlier that day by the father;

- A 21 page document titled "Participant Profile" from the Prudence Crandall Center dated January 8, 2018, regarding Ms. G.'s contacts with that program on various dates between October 1, 2013, and October 12, 2017;

- The following records prepared by the mother's

therapist, Ronald Klemba, from the Healing House of CT: "Mental Health Care Plan" dated April 12, 2017; a letter regarding her treatment there and diagnosis dated October 4, 2017; and "Psychotherapy Treatment Records" of individual therapy sessions between January, 2017, and January, 2018;

- Copies of police reports, some of which contained redactions, from the New Britain Police Department for incidents occurring on the following dates:

  - February 16, 2015 (when the father was taken to a hospital for observation after he sent photos to the mother suggesting that he intended to hurt himself and he then admitted making statements to the mother and police that he was intoxicated, depressed and might harm himself);

  - February 20, 2015 (when the father was arrested for disorderly conduct, unlawful restraint and risk of injury after he held the mother down on her bed and then caused property damage in the presence of then ten year old Aaliya);

  - March 30, 2015 (when police went to the mother's home after receiving an anonymous call about a possibly physical domestic incident there, spoke to the mother, who denied that the father was present and said that her daughter Aaliya was yelling in her sleep, but the father was found hiding under a blanket and then arrested for violation of a "no contact," "stay away" protective order[7]);

  - May 18, 2015 (when the father was arrested on five counts of violation of a protective order after the mother reported that he had been at her home and police confirmed that there were five active protective orders prohibiting him from contact with her or being at her residence);

  - June 11, 2015 (when the police responded to an anonymous complaint of a protective order violation, went to the mother's apartment, and searched for the father inside her residence without finding him);

  - June 15, 2015 (when the police went to the mother's home in the early morning hours after receiving an anonymous telephone call "stating they observed a male and female at the residence arguing" but the mother denied that the father was present or that any argument had occurred and would not allow police to enter her residence);

  - July 20, 2015 (when the police were unable to return a phone call made by the mother because her voice mailbox was full);

- August 5, 2015 (when the mother reported that the father had taken a vehicle belonging to the maternal grandmother without permission);

- August 16, 2015 (when the mother reported that Mr. M. had punched her in the face several times, a week earlier, and had threatened her earlier that day but the investigating police officer concluded that the remarks she was reporting did not constitute a threat and, after speaking to a third person, that the father had not caused any injury);

- December 5, 2015 (when the mother reported to the police that the respondent father had entered her room in the early morning hours while she was sleeping, yelled at her, pushed her in the face, cut her upper lip and slammed a phone on a dresser, then took her vehicle without her permission, and the police concluded that the father had violated a protective order[8] but, unable to find him, decided to seek a warrant for his arrest on charges of assault in the third degree, disorderly conduct, violation of a protective order, and taking a motor vehicle without the owner's permission);

- December 9, 2015 (reporting the father's arrest on a warrant for assault in the third degree and another charge that was redacted by agreement of the parties);

- June 29, 2017 (when the father was arrested for breach of peace, criminal mischief in the third degree, and violation of a protective order after the mother complained that he had damaged the door to her residence); and

- August 27, 2017 (when the police responded to a report by the mother that the father had assaulted her in her home but police officers found no probable cause because they did not find her report credible);[9]

- A Berlin Police Department case incident report regarding an arrest of the mother for operating under the influence and interfering with a police officer on November 5, 2017, after she was found under the influence of drugs or alcohol in her vehicle and then did not cooperate with the investigating officers; still photographs taken at the scene of the arrest; and a video recording from the "dash cam video" from one of the police cruisers on the scene showing Ms. G. outside her vehicle and then in the back seat of the police cruiser;

- Copies of the criminal history conviction records for the mother and father, dated September 6, 2017, from the Department of Emergency Services and

Public Protection that showed the following:

- The father was arrested on March 30, 2015, for violation of a protective order and on May 18, 2015, for five additional counts of that same offense, and was convicted on all of those charges on July 15, 2015, for which he received concurrent sentences of three years of incarceration, execution suspended, and three years of probation;

- The father was convicted for violations of those probations on May 4, 2016, and received concurrent sentences of 18 months incarceration;

- The father was arrested on December 9, 2015, for the assault on the mother that had occurred on December 5, 2015, and was convicted of this charge on May 4, 2016, and received a sentence of one year in jail, concurrent with the 18 month sentence for the violations of probation;

- The father was arrested on June 29, 2017, as described above; and

- The mother was arrested on November 5, 2017, as described above;

- A log from the Department of Correction listing the father's telephone calls between December 18, 2015, and December 6, 2016, and a DVD disk containing recordings of those calls (only four of which were introduced into evidence); and

- A copy of the Protection Order Registry dated January 2, 2018, showing the following active and expired family violence protective orders, all with Ms. G. as the protected person:

  - An unexpired 2005 family violence protective order against the mother's ex-husband (and Aaliya's father), Marciej W.;

  - Nine expired family violence protective orders against Mr. M. in criminal prosecutions brought against him in 2013 (two orders), 2014 (one order), and 2015 (six orders);

  - A standing criminal protective order entered against him on September 20, 2016, and not expiring until 2099; and

  - A full, no contact protective order that had been entered on June 30, 2017, in the criminal prosecution pending against father at the close of evidence in this proceeding and was in effect until the next hearing date scheduled after the close of evidence.

After the close of evidence and the receipt of transcripts, the parties submitted trial briefs, the last one being filed on March 1, 2018, and then waived oral

closing argument that had originally been requested. The court is not aware of proceedings pending in any other court regarding the custody of the child and has jurisdiction. As neither parent has claimed Native American heritage, the requirements of the Indian Child Welfare Act are not pertinent to these proceedings. The court has carefully considered the petition, the evidence presented, and the information or materials judicially noticed according to the standards required by law. The matter is now ready for decision, and the facts found herein were established by clear and convincing evidence.

I

PRELIMINARY FINDINGS OF FACT

A

Effect of Default

The respondent father, Anthony M., has been defaulted. Practice Book § 32a-2 (a) provides that child protection proceedings, including this petition for termination of parental rights, are civil matters. See also *In re Samantha C.*, 268 Conn. 614, 634, 847 A.2d 883 (2004), and *In re Shonna K.*, 77 Conn. App. 246, 253, 822 A.2d 1009 (2003). As in other civil matters, the entry of a default establishes admission of the material facts constituting the petitioner's cause of action and conclusively determines that the petitioner has prevailed on each of the elements at issue in the adjudicatory phase of this proceeding. *Commissioner of Social Services* v. *Smith*, 265 Conn. 723, 732–33, 830 A.2d 228 (2003) (respondent in child support proceeding who fails to respond to pleadings "is deemed to have judicially admitted the underlying facts of the support petition"); see also *Bank of America, FSB* v. *Franco*, 57 Conn. App. 688, 693, 751 A.2d 394 (2000). When the respondent father failed to appear for trial and was defaulted, "the court was permitted to take the facts contained in the pleadings to be true [as to him] and to rely on those facts in making its decision as to adjudication." *In re Pedro J. C.*, 154 Conn. App. 517, 521 n.3, 105 A.3d 943 (2014), overruled on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 173 A.3d 928 (2017), citing *In re Natalie J.*, 148 Conn. App. 193, 207, 83 A.3d 1278, cert. denied, 311 Conn. 930, 86 A.3d 1056 (2014). In an abundance of caution, appropriate to the gravity of the TPR issues at hand, however, the court has further considered the petitioner's evidence addressing the adjudicatory issues.

B

The Mother, Agnieszka G.

The respondent mother has a long history of mental health, domestic violence, and substance abuse issues that have negatively affected both her and her two children. In a telephone conversation she had on November

19, 2016, with the respondent father, she admitted that she has been an addict for more than 20 years. See recording 461, on petitioner's exhibit 29. In April, 2016, and again in November, 2017, she told treatment providers that she was using $40 to $100 worth of cocaine on a daily basis. Petitioner's exhibit 17, CHR Intake Form dated April 19, 2016, p. 1;[10] respondent mother's exhibit C, p. 12 of Intake Form;[11] and testimony of Lori Bergeron, her counselor at Milestone.[12] On numerous occasions between 2005 and the present,[13] the mother's substance abuse substantially impaired her ability to care for her children, including the occasion in November, 2016, when she drove while intoxicated with Avia in the car.

Aaliya, who is Ms. G.'s older child, has been a witness to extensive domestic violence involving Ms. G. Between 2005 and 2016, there were numerous such incidents between Ms. G. and Aaliya's father, Ms. G.'s mother (the children's maternal grandmother), and Avia's father, Mr. M., the respondent father in the present proceeding. Many of these incidents occurred when Ms. G. was intoxicated or under the influence of drugs. The evidence also showed that in 2014 and 2015 there were numerous incidents of domestic violence between these two respondents, and at least two of those incidents occurred in front of Aaliya, who was nine years old at the time of the 2014 incident and ten years old during the 2015 incident.[14] After the 2014 domestic violence incident, DCF social workers "tried to ensure the safety and well-being of Aaliya." Transcript of testimony of Amber Orvis on January 8, 2018, p. 128. Ms. G. would not cooperate with the department, however, or let the DCF social worker into her home. A vivid example of her unwillingness to cooperate is provided by an incident, recounted credibly at trial by DCF social worker Orvis, when that social worker went to the mother's home in an effort to ensure that Aalyia was safe, and after she had made several attempts to gain entry, Ms. G. leaned out of her window and said "Nice try. Try again." Id., 129.[15]

In July, 2015, Mr. M. was convicted on six counts of violating a protective order that had been entered by the criminal court with Ms. G. as the intended protected person. He received suspended sentences of three years on each of those counts and three years of probation. In December, 2015, Mr. M. was arrested again, this time for assault in the third degree after assaulting Ms. G. in her home and trying to choke her, and in May, 2016, he was convicted of that charge and two counts of violation of probation, for which he received a total effective sentence of 18 months of incarceration. The call log from the Connecticut Department of Correction (DOC) entered into evidence shows that Mr. M. and Ms. G. were in constant telephone contact during that period of incarceration.

The mother's older child, Aaliya, was also the subject of a neglect petition brought in August, 2007, after DCF received the report of domestic violence two months earlier between Ms. G. and the maternal grandmother that had resulted in minor injuries to Aaliya, as described in footnote 13 of this opinion. That case resulted in an adjudication of neglect and a period of protective supervision. Ms. G.'s unaddressed mental health and substance abuse issues and the repeating cycle of domestic violence resulted in another neglect petition being filed on Aaliya's behalf in August, 2015, on the ground that the child was living under conditions injurious to her well-being. The summary of facts alleged that Ms. G. had "not taken the proper steps to protect Aaliya from exposure to domestic violence." An addendum to the petition further alleged that the mother had "neglected Aaliya by exposing her to the verbal and physical abuse" between the parties and "puts the child at further risk as she demonstrates no insight into the risk [that] relationship . . . poses to Aaliya." Neither parent appeared at the initial hearing on September 17, 2015, and after finding that the mother had been properly served, the child's father had been notified of the petition by publication and neither parent was in the military services of the United States, the court, *Cohn, J.*, entered defaults against both parents, adjudicated the child to be neglected, and ordered a period of six months of protective supervision with the mother.[16] Although DCF again offered her services, Ms. G. still had no interest in cooperating, and she refused to sign any releases of information (which would have been necessary so that DCF could refer her to a service provider, for otherwise statutory confidentiality laws would have prevented the department from discussing her with any third party[17]).

On March 31, 2016, two weeks after the expiration of protective supervision in the 2015 neglect proceeding, the department received a report from The Hospital of Central Connecticut that Ms. G. had tested positive for cocaine and marijuana at the time of Avia's birth. Although the baby's urine tested negative for drugs, the meconium was later determined to be positive for cocaine. A DCF investigator spoke to hospital workers, one of whom told the investigator that the mother had acted erratically when told about the positive drug test and had "presented manic at times in the hospital." Petitioner's exhibit 22, DCF Investigation Protocol, p. 6. When the investigator initially met with Ms. G., the mother denied having used cocaine while pregnant, but "appeared sluggish, delayed in her responses . . . [and] combative at times . . . . She did not appear to be remorseful or apologetic. She did not appear to understand the concerns concerning the drug exposure and impact to her newborn infant." Id., 7. A few hours later, however, the mother "admitted to continuous marijuana, cocaine and alcohol use throughout her

pregnancy with Avia [and that] . . . she is addicted to drugs and needs help." Id. (her admission to continuous drug use during the pregnancy signifies that she had been using drugs throughout the period of protective supervision on the 2015 neglect case, and her lack of cooperation had prevented the department from learning about that substance abuse). The department offered to refer her to an inpatient substance abuse program at which her newborn child might also be placed with her, and although originally appearing receptive to that suggestion, within a few days the mother "was refusing to enter into substance abuse treatment." Id.

At the hospital, the mother agreed to a DCF safety plan that the maternal grandmother would take care of Aaliya and Avia and not permit Ms. G. to have unsupervised contact with the baby. On April 4, 2016, Avia was released from the hospital, but two days later the maternal grandmother asked DCF to take the child, and Ms. G., who had also been released from the hospital, admitted that "she got really drunk last night and smoked marijuana." Id., 8. She also told the social worker: "If I had money, I would have bought cocaine and did that too." She told the social worker that "she does not care anymore and that she wants DCF to take her kids." Id. The department invoked a 96 hour hold on Avia and removed her from the maternal grandmother's care, sought and obtained orders of temporary custody (OTCs) for both children,[18] and filed neglect petitions on behalf of both.

On April 15, 2016, Avia's parents both appeared at the preliminary hearing on the OTC, were appointed counsel and advised of their rights, entered denials to the allegations of neglect, but agreed for the OTC to be sustained. On April 28, 2016, Ms. G. entered an inpatient substance abuse treatment program at the New Life Center. Having continued to use drugs until then, she tested positive for cocaine and marijuana upon intake. According to the testimony of Samantha Larkin, a residential counselor at NLC, and certain written exhibits prepared by NLC about the mother's treatment there, Ms. G. initially appeared to do well there. She worked on her mental health issues (her counselor there testified that she had diagnoses of bipolar disorder and attention deficit hyperactivity disorder), her substance abuse history, and her "history of abusive relationships,"[19] particularly with Avia's father, Mr. M. On July 28, 2016, the mother entered a plea of nolo contendere to the neglect petition, and the child was placed with her at NLC under an order of protective supervision for nine months (without prejudice to Mr. M., who was allowed to stand silent as a noncustodial parent a month later).

On November 7, 2016, Ms. G. returned to the facility from a pass in an intoxicated state, and she admitted

to having driven Avia in her vehicle while in that condition.[20] NLC notified the department, which removed the child from her mother's care on a 96 hour hold, sought and obtained another OTC for the child, and filed a motion to modify the disposition (from protective supervision to commitment). After initially contesting that motion and the OTC, on November 28, 2016, both parents subsequently agreed to the motion for modification, the OTC was withdrawn, and Avia was committed to the commissioner. She has been placed in nonrelative foster care since then, in the same household where she had lived during the three months between the original OTC and her placement with Ms. G. under protective supervision at NLC.

Ms. G. stayed at the NLC for only another week after Avia's removal and left the facility on November 14, 2016, against the advice of her counselor there. That counselor, Samantha Larkin, testified that "I definitely wanted her to stay,"[21] and the NLC Discharge Form reports that "[c]lient presented irrational and impulsive at time [of] discharge. Expectations for future function are poor due to [client's] inability to remain in treatment and collaborate on discharge and aftercare in order to facilitate a smooth transition back into the community." Petitioner's exhibit 5, CHR Discharge Form dated November 15, 2016, p. 1. The DCF social worker recommended to Ms. G. that she enter another inpatient mother-daughter treatment program at Amethyst House, but she refused. NLC referred her to the intensive outpatient program at Wheeler Clinic, and DCF then adopted that recommendation.

While the mother was attending the inpatient mother-child treatment program at the New Life Center between April and November of 2016, DCF had referred her to The Connection for case management and subsidized housing through the Supportive Housing Program. After leaving NLC, Ms. G. found a three bedroom apartment that The Connection agreed would satisfy the subsidy requirements, and Ms. G. moved into that apartment later in November. The Supportive Housing program provided her with "basic furniture" for the apartment, paid off an outstanding electric bill of $1600, and paid the gas company $100 to activate gas service. (The Connection program also helped her in other ways, such as assisting with immigration issues and providing transportation to an inpatient program.) Ms. G. has lived at that apartment ever since, although at the end of evidence she was behind in her rent, out of compliance with Supportive Housing requirements, and did not yet have employment or legal income to pay for her rent and other expenses.

Over the course of the next few months after leaving the NLC facility, Ms. G. entered and was discharged unsuccessfully from a number of substance abuse treatment programs. She began attending LifeLine, Wheeler

Clinic's Adult Intensive Outpatient Program (IOP), but by mid-January, 2017, however, she had relapsed on cocaine and stopped going to treatment there, and Wheeler Clinic then discharged her for noncompliance. She told The Connection case manager that she had stopped going to Wheeler Clinic because "LifeLine [IOP] was not helping her." Petitioner's exhibit 18, DCF Monthly Client Contact Reports from The Connection, report dated February 3, 2017. She told a DCF social worker on January 23, 2017, that she "wanted to go inpatient"; petitioner's exhibit 23, Running Narrative Document, p. 15 of 138; but two days later she said that she no longer wanted to go inpatient "and felt she could maintain her sobriety doing Intensive Outpatient Treatment." Id. Next, she went to the Intensive Outpatient Program at the Farrell Treatment Center, but by the end of February, 2017, she had also been discharged from that program unsuccessfully, with Farrell recommending that she engage in a higher level of care in an inpatient program.

Instead, Ms. G. went to another Intensive Outpatient Program, this one at Community Mental Health Affiliates, beginning on March 9, 2017. From the court's perspective, however, that treatment did not begin on an auspicious note, as she lied to program staff at her initial intake when she claimed that "she had been sober 8 years until she recently (Dec. 2016) relapsed on intermittent cocaine and marijuana use when her abusive husband was released from jail." Petitioner's exhibit 31, CMHA Intake Assessment, dated March 9, 2017, p. 1. She participated in that IOP program for two months, but missed seventeen of her scheduled thirty-one appointments. After she continued to relapse, CMHA discharged her in May, 2017, as unsuccessful for noncompliance with its treatment and poor attendance and recommended a higher level of treatment for her in an inpatient program.

Over the next few months, the mother procrastinated about entering the inpatient treatment that had been recommended after her unsuccessful discharges from the IOP programs at Farrell Treatment Center and CMHA. For example, she told her The Connection case manager that she "planned to go into rehab on May 22," at the New Life Center in Putnam. Respondent mother's exhibit B, The Connection Client Chronological Notes, unspecified date, p. 27. But her next formal treatment was another IOP program, when she returned to Farrell Treatment Center in August, 2017. Her attendance there was sporadic, and after she admitted more relapses and had some positive drug screens, FTC discharged her in September, 2017, with another recommendation that she enter inpatient treatment. She was on a waiting list for an inpatient treatment program at Rushford when, after another relapse in November, 2017, and operating a motor vehicle while under the influence, she entered CMR's 30 day inpatient Milestone

substance abuse treatment facility, from which she was successfully discharged after approximately thirty days of treatment. At of the end of evidence, she had returned for outpatient treatment at FTC. Throughout the course of these proceedings, DCF social workers have asked her to submit to hair tests to assess her drug usage. The specific steps directed her to "submit to random drug testing; the time and method of testing will be up to DCF to decide." Ms. G. has refused to comply with that request, except for one occasion, when she agreed to provide a hair sample but then never actually did so.

A recurring theme of the mother's statements about her substance abuse has been that her drug and alcohol relapses are the result of two triggering motivations— to relieve distress at violence from Mr. M. or to cope with her emotions.[22] The specific steps ordered when Avia was committed to the commissioner on November 28, 2016, directed Ms. G. to engage in individual counseling, with goals that included for her to "[l]earn triggers for substance abuse and alternative coping mechanism[s]," "understand impact of domestic violence and substance abuse on children," "[a]ddress mental health needs in individual counseling in order to maintain emotional stability [and] continue in care for mental health needs." Petitioner's exhibit 14, specific steps for mother, Addendum. The specific steps also ordered her to "[a]ttend and create an appropriate domestic violence program," and one of the goals of her individual counseling was to "[c]reate and maintain [a] safe, stable, and nurturing home environment free from domestic violence and substance abuse." Id., p. 1 and Addendum.

Consistent with the specific steps, DCF referred the mother for mental health treatment at Wheeler Clinic after her discharge from the New Life Center program in November, 2016, but Ms. G. instead chose to select her own mental health clinician,[23] and since January of 2017, she has been attending weekly therapy with Ronald Klemba, a licensed marriage and family therapist at Healing House of CT in New Britain. Social worker Fazzolari testified that he "specializes in domestic violence." Transcript of testimony, January 9, 2018, p. 111. In a letter dated October 4, 2017, Klemba wrote that her treatment with him was intended "to address symptoms impairing her ability to function on certain levels" and that she "has proven to be a reliable, engaged client." Respondent mother's exhibit F. His treatment records for June, 2017 through January of 2018, however, show that any progress she may have made has been slow and, even when construed most favorably for her, that she has just begun taking steps toward consistent sobriety.[24] It is significant, however, that even though Klemba's most recent treatment record introduced into evidence commented that Ms. G. presented herself on January 11, 2018, as "committed to sobriety," therapist Klemba's own conclusion about her "progress" was that

she was "unchanged." See Psychotherapy Treatment Records for January 11, 2018, contained in respondent mother's exhibit F.

After the 2014 report of domestic violence in front of Aaliya, DCF referred Ms. G. to the Prudence Crandall Center, a New Britain domestic violence shelter and service provider. Records from that agency introduced into evidence by the mother[25] show that Prudence Crandall staff twice called her home in 2014 but were unable to reach her.[26] The current DCF social worker, Alison Sroka, was also then assigned to the mother's case and she testified that, "to my knowledge," Ms. G. did not seek any services from Prudence Crandall at that time. Transcript of testimony, January 17, 2018, pp. 48–49. The evidence shows that, in fact, the mother had approximately ten contacts with Prudence Crandall between 2014 and 2017 in which she received counseling and support. But, at least until recently,[27] she continued her relationship with Mr. M. and incidents of domestic violence continued to occur during most of that time. The department social worker also provided an opportunity for Ms. G. to meet for a consultation with a domestic violence specialist at DCF, who suggested various referrals to her. One of those was a domestic violence program at The Hospital of Central Connecticut, but the mother declined that service, telling her social worker that she did not feel comfortable addressing these issues in a group setting. She instead agreed to a referral offered by DCF to Harold Fischer and Associates, a private therapist offering individualized domestic violence services. Unfortunately, she did not follow up on that referral or begin services there.

## C

### The Father, Antonio M.

In 2009, the father's parental rights were terminated to his then 12 year old son, Antonio S., after Mr. M. submitted his written consent in a TPR proceeding brought in 2006 by the Commissioner of Children and Families to terminate the parental rights of the child's natural mother and father. He is the father of eight other children, including Avia, all of whom have had involvement with DCF because of parental neglect.

Mr. M. married the respondent mother in January, 2014. As has been previously discussed and is shown by the police reports and his criminal conviction and protective order history introduced into evidence, their relationship has been marred by numerous incidents of domestic violence on his part toward Ms. G. He was incarcerated and serving the sentences imposed in December, 2015, when the commissioner brought the neglect petition on Avia's behalf in April, 2016, and there has been at least one more incident of domestic violence between the parents since then.

After Mr. M.'s release from incarceration in Decem-

ber, 2016, he spent three months at a halfway house in New Britain, where he received anger management and mental health services. The department also provided him weekly visits with Avia while he was there. In March, 2017, DCF social worker Orvis was developing a discharge plan for him, when he abruptly left the halfway house, and his whereabouts were then unknown to DCF until he appeared at the initial hearing on the TPR petition on June 2, 2017. He missed three of the five scheduled visits with his daughter between then and the end of trial.

After that court hearing, DCF requested that Mr. M. submit to a substance abuse evaluation and urine screen, and he attended Wheeler Clinic for that purpose in August, 2017. The toxicology report was negative and there were no recommendations for treatment or services. DCF also referred him to Radiance Innovative Services for domestic violence services but, after attending a few sessions, he stopped doing so. Although the subject of a standing criminal protective order that he not assault, threaten, abuse, or harass Ms. G., he went to her home on June 29, 2017, and struck the door to her premises "so hard that the trim on the inside broke away and some wood split near the bottom hinge." Petitioner's exhibit 9A, New Britain Police Department Incident Report dated June 29, 2017, p. 2.[28] He was arrested on charges of criminal mischief, breach of the peace and violation of a protective order, which remained pending at the close of evidence.

## II

### ADJUDICATORY PHASE OF TPR PROCEEDING

In the adjudicatory phase of a proceeding under § 17a-112 (j), the court must determine whether the commissioner has proven by clear and convincing evidence[29] both a statutory ground for termination of parental rights and that the department complied with its reasonable efforts obligations. See *In re William R. III*, 65 Conn. App. 538, 546, 782 A.2d 1262 (2001); *In re Michael R.*, 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998). Reasonable efforts need not be proven, however, if the petitioner proves by clear and convincing evidence that a parent was unwilling or unable to benefit from reunification efforts. *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009).

Under Practice Book § 35a-7 (a), in the adjudicatory phase of the proceeding, "the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." See also *In re Anthony H.*, 104 Conn. App. 744, 757, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100

(2008). "In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis omitted; internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 495, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).[30] On the first day of trial, after the father had been defaulted, the petition was amended with regard to the factual allegations supporting the petitioner's claims for termination of the respondents' parental rights. That date has therefore become the adjudicatory date on which the allegations of the petition must be assessed.

## A

### Reasonable Efforts Findings

In TPR proceedings brought under § 17a-112 (j), the court must determine whether there is clear and convincing evidence that the department made reasonable efforts to locate the parent and to reunify the child with him or her, unless the court finds that the parent was unable or unwilling to benefit from reunification efforts. "When making its reasonable efforts determination during the adjudicatory phase, the court is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." *In re Paul O.*, 141 Conn. App. 477, 483, 62 A.3d 637, cert. denied, 308 Conn. 933, 64 A.3d 332 (2013). But see *In re Oreoluwa O.*, 321 Conn. 523, 543–44, 139 A.3d 674 (2016), holding that the reasonable efforts obligation was properly measured in that case by considering events after the TPR petition had been filed.[31]

Although requiring DCF to make "reasonable efforts" to reunify the child with the parent, neither the statute nor the federal act from which the reasonable efforts requirement is drawn defines either the term "reasonable" or the term "efforts." See, e.g., *In re Eden F.*, 48 Conn. App. 290, 311, 710 A.2d 771 (1998), rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1999). Absent any statutory definition, our courts have instead used the commonly understood meanings of both terms. Id., 311–12. As Judge Foley has aptly observed, "providing services to rehabilitate the deficient parent is the crucial ingredient to reasonable efforts." (Emphasis omitted.) *In re Jessica H.*, Superior Court, judicial district of Middlesex, Juvenile Matters, Child Protection Session at Middletown (April 21, 1998) (*Foley, J.*). Moreover, "[t]he reasonableness of the department's efforts must be assessed in the context of each case. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing every-

thing reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Internal quotation marks omitted.) *In re Gabriella A.*, 154 Conn. App. 177, 182–83, 104 A.3d 805 (2014), aff'd, 319 Conn. 775, 127 A.3d 948 (2015). The evidence in this case proved clearly and convincingly that as of the adjudicatory date for the petition, the department had made reasonable efforts to locate both parents and reasonable efforts to reunify both parents with the child.

### 1

### Reasonable Efforts to Locate

The department has had ongoing contact with the mother throughout the underlying neglect and TPR proceedings, and properly caused her to be served with both petitions. The father was incarcerated and serving an eighteen month sentence when the commissioner brought the underlying neglect petition, and the department caused him to be served in-hand with that petition. On April 15, 2016, he appeared at the preliminary hearing on the order of temporary custody (OTC) entered ex parte seven days earlier. The father was advised of his rights that day and appointed counsel, and along with the mother agreed for the OTC to be sustained. He was also specifically advised that day to keep his address current with the department, his attorney, and the clerk's office, but after his release from incarceration in March, 2017, he did not initially do so. While he was in parts unknown, DCF attempted to locate him by asking his mother, other relatives, and former associates if they knew his location, and also did a Lexis search for him, but was unable to ascertain his whereabouts. After DCF submitted an affidavit to that effect, the court authorized notice to him of the TPR petition by publication. When he appeared at the initial hearing on the TPR petition held on June 1, 2017, he provided a New Britain address. Trial on the petition was scheduled that day, in father's presence, for January 8 and 9 of 2018, at which time he did not appear. After his appearance at the TPR plea, the department had ongoing contact with him and provided visitation with the child. Under these circumstances, and the others proven at trial, it is found by clear and convincing evidence that the department made reasonable efforts to locate both the mother and the father.

### 2

### Reasonable Efforts to Reunify

### a

### Mother, Agnieszka G.

The evidence shows that the issues leading to the initial and subsequent removals of Avia from Ms. G.'s

custody were her ongoing substance abuse and mental health problems; in addition, her continuing involvement with violent and abusive intimate partners has been a barrier to reunification. This court has noted several times that "[e]fforts to reunify a parent with a child should begin with identifying any barriers to the parent being willing or able to meet the child's needs and to provide the child with stable and competent care appropriate for the child's age and needs, identifying culturally competent services or programs that are appropriate for addressing those barriers and helping the parent assume a responsible position in the child's life, informing the parent of the steps they need to take to get their child back, and then referring a parent to those services and programs while at the same time providing the parent ongoing visitation with the child to help maintain their relationship." *In re Samantha A.*, Superior Court, judicial district of New Britain, Juvenile Matters, Docket No. H14-CP14-011171-A (May 20, 2016). The department here met all those obligations: it identified the barriers to reunification and appropriate services to address those barriers, informed Ms. G. of the need to engage in these services in order for Avia to be returned to her care, referred the mother to the various services and programs as recounted above, and offered her ongoing visitation. The evidence proved clearly and convincingly that the department made reasonable efforts to reunify Avia with Ms. G. by referring her on multiple occasions to services and treatment providers to help her address these problems.

In her trial brief, Ms. G. argues that the department's failure to offer her another "mother-daughter" program prevents a finding of reasonable efforts to reunify, but the court disagrees. Since the department and Ms. G.'s service providers have all repeatedly asked her to reenter inpatient treatment, her only complaint can be that the department did not offer her another inpatient treatment program that offered the prospect of the child residing with her. The premise of the mother's argument on this point, however, is not correct. The department did offer her another opportunity to participate in a mother-daughter treatment program. First, it must be noted that Ms. G. left the New Life Center's mother-daughter program on November 14, 2016, after her child was removed, but New Life Center was then still willing to provide her with ongoing treatment. Second, two weeks later, the department did offer her another opportunity to attend a mother-daughter program, this time at Amethyst House. See petitioner's exhibit 1, p. 9. Ms. G. refused. That was the second time the department had offered and the mother had refused a referral there. After that, she attended and was discharged from several different inpatient treatment programs for noncompliance, with a recommendation after two of these discharges for inpatient treatment that she refused. For example, in June, 2017, she acknowledged to the DCF

social worker that Farrell Treatment Center had recommended inpatient treatment but said she was going to instead attend the program to obtain her CNA certificate.

Our courts have repeatedly emphasized, however, that "reasonable efforts" does not mean "doing everything possible," only "doing everything reasonable." The courts have said that "reasonableness" is an objective standard, but have also repeatedly emphasized that "whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." *In re Eden F.*, supra, 48 Conn. App. 312 (holding that statutory requirement for reasonable efforts to reunify not in effect at time that the TPR petition was filed in that case). To the extent that Ms. G.'s argument is that the department should have offered a fourth referral to a mother-daughter program, after she had left one before its conclusion and twice rejected referral to another such program and after her repeated relapses in 2017 during numerous courses of treatment, it would not have been "reasonable" to remove Avia from the safe and secure foster placement where she has done so well while the mother participated in additional treatment whose prospects, based on the mother's long history of relapses after treatment, would appear dismal. It would only have been "reasonable" to place the child back with the mother in an inpatient mother-daughter setting if there were reasonable prospects for success, both during and after that treatment.

The commissioner argues in her trial brief that the respondent mother has been unwilling or unable to benefit from reunification efforts. The evidence contained exhibits regarding the mother's treatment at the New Life Center, CMHA, Farrell Treatment Center, and CHR's Milestone Program. These four programs encompass the bulk of Ms. G.'s substance abuse treatment during the period covered by this case. The court also heard testimony from individual treatment providers from three of these four programs: Samantha Larkin from the New Life Center, Daniel Millstein from Farrell Treatment Center and Lori Bergeron from Milestone. The evidence also contains evidence from three other service providers who engaged with Ms. G. during this period: The Connection, Prudence Crandall Center, and the Healing House of CT. Together, this evidence, along with the testimony of DCF employees and the contents of DCF-created exhibits, portrays Ms. G. in two different lights.

On the one hand, the testimony and exhibits demonstrate that, at times, Ms. G. appears sincere in her desire to overcome her addiction and end her abusive relationship with Mr. M. and also sometimes seems to be making progress toward those goals. The evidence is also permeated, however, by examples of her lack of sincerity

and candor in her treatment efforts. When the TPR petition was filed on May 2, 2017, it may well have been said that the mother, as of that time, had been unwilling or unable to benefit from reunification efforts. As of that date, she had left the New Life Center in November, 2016, against its recommendation after relapsing, refused DCF's offer that same month for another inpatient program, stopped attending the intensive outpatient program at Wheeler Clinic that had been recommended by NLC and DCF after her discharge from NLC, been discharged from the Farrell Treatment Center intensive outpatient program for noncompliance and with a recommendation, which she rejected, for inpatient treatment, and was one day away from being discharged from the CMHA intensive outpatient program after relapsing during that treatment and missing many treatment sessions, again with a recommendation for more intensive inpatient treatment. At that time in her life, she was not yet willing or able to overcome the grip of addiction on her life, as shown by her statements to her therapist that "sobriety was too painful to feel" (on February 7, 2017) and that she "cannot see life without getting high" (on March 7, 2017). Petitioner's exhibit F. Although she had identified the stress of a violent and "toxic" relationship with her husband as one trigger for her substance abuse,[32] she had voluntarily maintained her relationship with him while he was incarcerated for violating protective orders for her benefit. And, as of that time, she was not yet willing to be honest with her treatment providers; for example, at her intake at CMHA on March 9, 2017, she falsely reported that "she had been sober 8 years until she recently (Dec. 2016) relapsed on intermittent cocaine and marijuana use . . . ." Petitioner's exhibit 31, p. 1 of 12.

The petitioner chose, at the time of trial, however, to amend the petition to add allegations, thereby amending the adjudicatory date, and the mother's willingness and ability to benefit from reunification efforts must thus be assessed as of that later juncture. By early January, 2018, the evidence does not portray such an unqualified pattern. The records of the mother's therapist, for example, show recent signs of a desire and willingness on Ms. G.'s part to change, although not without some contrary indication of calculation on her part. Ms. G. appeared to be more honest with her treatment providers. And she had filed for divorce from her husband. On the other hand, her intoxication that led to her arrest in November, 2017, shows that sobriety remains an elusive goal. Her actions displayed on the DVD recording of her arrest and conduct later at the local jail show not only that she was inebriated but also suggest an element of cunning and calculation on her part. Her report to the police in August, 2017, that the father had entered her home was probably false and suggests that she was trying to convince others that

she was no longer emotionally attached to him, thereby calling into question the sincerity of her actions. The evidence as of the amended adjudicatory date is thus decidedly mixed, but, containing some indications of a desire on Ms. G.'s part to change, does not prove clearly and convincingly that, as of that date, she was still unwilling or unable to benefit from reunification efforts.

### b

### Father, Antonio M.

The evidence proved clearly and convincingly that DCF made reasonable efforts to reunify Avia with her father as of the date when the petitions were filed and also at the time of trial. It offered him visitation with her to allow them to develop a bond. His proclivity for violence and aggression in his relationships with intimate partners has been a barrier to his reunification, not just with Avia, but with other children of his as well and upon his release from incarceration, DCF referred him for domestic violence treatment services to address this problem. Earlier cases that he had with the department involving other children also led DCF to believe that he also had substance abuse and mental health issues, and the department appropriately referred him for an Advanced Behavioral Health (ABH) evaluation of treatment needs in these areas upon his release from incarceration.

### B

### Statutory Grounds for Termination

As statutory grounds for terminating parental rights, the TPR petition alleges: Failure to rehabilitate against both parents, pursuant to § 17a-112 (j) (3) (B) (i), and neglect of a child under the age of seven and failure to rehabilitate by a parent whose parental rights to another child have been terminated in a proceeding brought by DCF, against the respondent father, pursuant to § 17a-112 (j) (3) (E).[33]

To prevail on the petition as to either parent, the commissioner must prove at least one of the statutory grounds for terminating that person's parental rights by clear and convincing evidence. See *In re Juvenile Appeal (84–BC)*, 194 Conn. 252, 258, 479 A.2d 1204 (1984); *In re Michael R.*, supra, 49 Conn. App. 512. As is more thoroughly discussed below, the statutory ground pursuant to § 17a-112 (j) (3) (B) (i) was proven by clear and convincing evidence with regard to both respondent parents, and the statutory ground pursuant to § 17a-112 (j) (3) (E) was proven by clear and convincing evidence against the respondent father.

### 1

### Prior Adjudication and Provision of Specific Steps

The failure to rehabilitate ground for termination of parental rights under § 17a-112 (j) (3) (B) (i) requires

that the child was previously found to have been neglected or uncared for, and that requirement is satisfied by Avia's adjudication as neglected on July 28, 2016.

In *In re Elvin G.*, 310 Conn. 485, 503, 78 A.3d 797 (2013), the court held that this clause in the TPR statute requires proof that a parent had been provided with specific steps to take to facilitate the return of the child in question to that parent, and the evidence proved here that this requirement was met here. The required specific steps were ordered on an ex parte basis upon the granting of the OTC on April 8, 2016, and those ex parte orders were served four days later on the parents by a marshal, who made in-hand service on the father and abode service on the mother. At the preliminary hearing on the OTC on April 15, 2016, this judge entered preliminary specific steps in the presence of both parents; that same day both parents signed the specific steps that had been ordered and affirmatively waived any formal reading of the steps by the court. When the order of protective supervision was entered on July 28, 2016, final specific steps were ordered in the mother's presence for both parents. A month later, on August 31, 2016, the father was allowed to stand silent to the neglect adjudication, and the Memorandum of Hearing for the court proceeding that day shows that he waived a formal reading of the steps. When the second OTC was entered on November 10, 2016, the required orders of specific steps were served four days later on the parents by a marshal, and when the child was committed to DCF on November 28, 2016, final specific steps were again ordered and the parents waived a formal reading of the steps. The mother was physically present in court that day and signed the steps. The incarcerated father had participated in the proceeding by video, and he signed his copy of the steps on December 1, 2016.[34]

2

Neglect of a Child under the Age of Seven

Subparagraph (E) of § 17a-112 (j) (3) requires proof, not of a prior neglect adjudication, but that a child under the age of seven years is neglected or uncared for as of the petition's adjudicatory date. Avia is certainly under the age of seven, but on the adjudicatory date she had been in DCF care for more than a year, and there could thus be no evidence here of actual neglect on or near the adjudicatory date. The department's proof of neglect to satisfy subparagraph (E) must therefore rely instead on the doctrine of predictive neglect. As our courts have noted, this doctrine "is grounded in the state's responsibility to avoid harm to the well-being of a child . . . ." *In re T.K.*, 105 Conn. App. 502, 513, 939 A.2d 9 (finding child was permitted to live under circumstances injurious to her health because mother had mental health problems resulting in obsessive thoughts about harming herself and her child), cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

Under this doctrine, DCF and the juvenile court do not have to wait until a child is actually neglected, and it explicitly recognizes the state's authority and responsibility to act before harm occurs. See *In re Francisco R.*, 111 Conn. App. 529, 535–38, 959 A.2d 1079 (2008); *In re Michael D.*, 58 Conn. App. 119, 123–25, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000). As explained by our Supreme Court in *In re Joseph W.*, 305 Conn. 633, 646, 46 A.3d 59 (2012), in cases involving predictive neglect the court must find that "if the child remained in the current situation, the child would be denied proper care and attention, physically, educationally, emotionally or morally . . . or would be permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth . . . ." (Citation omitted; internal quotation marks omitted.) Although that case referred to the fair preponderance of the evidence standard applicable to neglect proceedings, since the present case is a TPR proceeding, such proof would have to meet the more exacting standard of clear and convincing evidence.

The evidence proved here clearly and convincingly that at the time the TPR petition was filed and on the amended adjudicatory date Avia would be neglected in the care of either parent. The evidence discussed above shows that Avia would be neglected if left in the mother's care. The father has neither developed nor attempted to maintain a parent-child relationship with her, even forgetting or cancelling visits that DCF offered. Mr. M. was present in court on June 1, 2017, when the court scheduled trial on the TPR petition for January 8 and 9 of 2018, and his failure to attend the trial shows his lack of interest in or concern for the child. His arrest for another domestic violence incident in June, 2017, shows that he has yet to benefit from any treatment or services while incarcerated, at the halfway house or in the community that would help him learn how to control his anger and aggression in his relationships with intimate partners. Without such knowledge or the ability to provide a safe home, he would not be able to meet Avia's need for a safe and secure environment. As shown by the incident between Mr. M. and Ms. G. in which Aaliya attempted to intervene (and which is described more thoroughly elsewhere, in footnote 14 and in part II B 4 of this opinion), children themselves can be placed at physical risk during domestic violence between adults, and such a setting thus not only damages their sense of safety and provides a negative behavioral role model, but also jeopardizes their actual safety. The neglect of his many other children would only be repeated if Avia were placed with him.

3

Prior Termination of Parental Rights

Section 17a-112 (j) (3) (E) also requires proof that a

parent had previously lost parental rights pursuant to a petition filed by the Commissioner of Children and Families, and the evidence here proved clearly and convincingly that on January 20, 2009, Mr. M.'s parental rights to another child were terminated in a TPR proceeding brought by the commissioner.

## 4

### The Parents' "Rehabilitative Status"

Both of these subparagraphs of § 17a-112 (j) (3) have one statutory element in common, each requiring proof that a parent has failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of the child. "Personal rehabilitation as used in [§ 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999). "[I]n assessing rehabilitation, the critical issue is . . . whether the parent . . . has gained the ability to care for the particular needs of the child at issue." *In re Danuael D.*, 51 Conn. App. 829, 840, 724 A.2d 546 (1999). As this court has observed elsewhere, the crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the problems and deficiencies in parenting that led to state intervention so that the parent can, considering the age and needs of the child, assume a responsible position in the child's life, or will be able to do so within a reasonable time in the future. *In re Zachary W.*, Superior Court, judicial district of Hartford, Juvenile Matters, Docket No. HP12-CP06-011133-A (May 18, 2011). "What is a reasonable time is a factual determination that must be made on a case-by-case basis"; *In re Michael L.*, 56 Conn. App. 688, 694, 745 A.2d 847 (2000); depending on the age and needs of the particular child. *In re Shannon S.*, 41 Conn. Supp. 145, 154, 562 A.2d 79, aff'd, 19 Conn. App. 20, 560 A.2d 993 (1989). The failure to rehabilitate ground for termination of parental rights, under either § 17a-112 (j) (3) (B) (i) or (E), thus requires the court to assess the rehabilitative status of a parent in relationship to the age and needs of a particular child, i.e., their readiness to meet those needs as of the adjudicatory date or in a reasonable time thereafter. Here, the court has also

considered the parents' rehabilitative status as of the end of trial. That evidence includes the information recited below in the dispositional portion of this decision about the parents' compliance before the adjudicatory date with the specific steps.

When the TPR petition was filed on May 2, 2017, Avia was barely 13 months old. On the amended adjudicatory date of January 8, 2018, she was only 21 months old. Her first and most obvious need, both when the petition was filed and on the amended adjudicatory date, was for a sober, responsible adult caretaker who will keep her safe and provide stable, competent care for her; but the two parents' histories show their inabilities at any of the relevant times to meet this need. Keeping a child safe is a paramount need for a child of Avia's age. Toddlers of her age at the end of trial are mobile and can be active, but they lack common sense and any judgment and are at constant risk of doing something dangerous to themselves—climbing onto an object from which she can fall, leaving the safety of her home and opening a door to the outside and venturing into the street, or exposing herself to other dangers are just some of the hazardous activities that any child her age may undertake if left unsupervised. Dangerous situations can occur quickly for a toddler and Avia is completely depending on having a vigilant, alert and competent caretaker to keep her safe. A parent under the influence of drugs or alcohol cannot be counted on to be alert, ready and able to recognize and respond to dangerous situations, and keep such a child safe. The person that the court viewed, when the video was played at trial of Ms. G.'s behavior at the time of her arrest last November for operating under the influence, would not be competent or capable in that condition of keeping a child of Avia's age safe.

Ms. G. has been unable, both during Avia's life and, if her own account to her husband is to be believed, for many years before, to demonstrate that she can maintain sobriety or serve as a competent parent. The mother has repeatedly relapsed on drugs or alcohol despite participating in numerous drug treatment programs since the child's original removal from her custody. The evidence also demonstrates her inability to use good judgment, to accept responsibility for her conduct, and to remain sober over time. Although Ms. G. appeared alert and sober at trial and, according to her substance abuse counselor at the 30-day inpatient program that the mother completed just before trial began, had done well there, her history of continuing relapses after substance abuse treatment offers little hope or confidence today that she will not again relapse. The evidence, according to her counselors and the treatment records from the New Life Center and Milestone, shows that Ms. G. apparently was able to maintain sobriety while within the confines of those two inpatient treatment programs—although when given a day pass

from the New Life Center after six months there, she relapsed. The evidence also shows utter lack of success in maintaining sobriety in the community after inpatient treatment, even if she were attending three times per week intensive outpatient substance abuse treatment. After her discharge from Milestone, she had attended only one treatment session at the Farrell Treatment Center as of the time of trial and had already missed one session, and a 50 percent attendance record would hardly suggest successful treatment.

In addition, she refused to comply with the court order for her to submit to a hair test before an in-court review in January, 2017, and has repeatedly refused to comply with numerous requests by DCF to submit to hair tests, as was ordered in the specific steps. (See petitioner's exhibit 14.) In October, 2017, she did agree to participate in a hair test, but then did not do so. The logical inference from these repeated refusals is that Ms. G. was continuing to use illegal substances or abuse alcohol, an inference confirmed by her intoxication at the time of her November, 2017 arrest and vividly corroborated by her admission, upon intake to the CHR inpatient program on November 29, 2017, that she had used cocaine on twenty days in the last month. Such refusals to submit to hair tests prevent DCF from verifying any claims of sobriety and must be considered in light of the mother's statement to the father a year earlier that "she was going to put on a show for now," thereby suggesting an intent to try to deceive DCF about her ongoing substance abuse and demonstrating a legitimate need to verify any such claims.

Treatment counselor Daniel Millstein testified that the mother would need to demonstrate sobriety in the community for a period of at least six months "before you could say she's really affected a solid recovery"; transcript of testimony, January 9, 2018, p. 43; but Ms. G.'s history of repeated relapses after longer periods of sobriety show that Millstein's estimate is woefully short for her. Ms. G. claimed to have been sober for four years, between 2010 and 2014, for example, but by the year 2015 and into early 2016 she was continuously using marijuana and cocaine up to the time of Avia's birth, and after that until she entered the NLC facility. She has continued to test positive for illegal substances throughout Avia's life, and short periods of sobriety during this period have not proven indicative that Ms. G. would continue to refrain from substance abuse. Her repeated refusals to submit to hair follicle substance abuse testing show a desire on her part to conceal the extent of her substance abuse. A few weeks of sobriety and abstinence at the time of trial do not show her to be ready then or in the reasonable future to assume responsibility for Avia's safety and well-being.

In addition, domestic violence has continued between the parents, and neither one has shown himself

or herself ready to end such a cycle of violence. Despite the fact that the father served 18 months in jail for violence against the mother, Ms. G. steadfastly maintained her relationship with him until, perhaps, recently. Although Ms. G. recently filed for divorce from Mr. M., she has done nothing to show that she is ready to end her pattern of involvement with violent intimate partners. Inventing a false story about him assaulting her and slashing the tires on his motor vehicle when she found him at another woman's house, as the evidence showed that Ms. G. has done, both suggest that she continues to be emotionally invested in her relationship with Mr. M. The fathers of both of her children have been violent to her, and the end to the violent relationship with the father of her first child did not motivate or prompt Ms. G. to avoid a relationship or parenthood with another violent intimate partner. Mr. M. continues to commit acts of domestic violence and has shown no willingness to address the issues of intimate partner violence that have characterized his relationships with Ms. G. and the mothers of his other children and endangered the safety of Ms. G.'s older daughter at least once.

The violence of the incident that occurred in the presence of Avia's older sister in February, 2015, when Mr. M. stood over Ms. G., choking her (and is described more thoroughly in footnote 14 of this opinion), shows the risk to children when violence occurs between their parents: when Aaliya tried to intervene in that incident, Mr. M. continued to engage in violence and the child could have been hurt as a result. After years of exposure to domestic violence between her mother and other adults, 13 year old Aaliya is now reported by the TPR social study to "become verbally aggressive" and to use profanities during arguments with her foster mother; and when she gets upset or angry at school "she becomes enraged (yells, screams, gets right in the faces of other students)." Petitioner's exhibit 1, pp. 6–7. It is to be hoped that Avia will not have the same exposure to domestic violence, as she needs the opportunity to live instead with caretakers and role models who will both keep her safe and also help her learn how to resolve disagreements without resort to threats or violence.

Thus, both parents need to learn how to engage in intimate relationships without resorting to violence or involving themselves with intimate partners who will be abusive, and neither of these respondents has yet shown that willingness or ability. DCF has referred the mother to several different services and treatment providers willing to support her in ending her relationship with Mr. M. and to help her learn how to avoid abusive relationships in the future, but she has completed none of them. When she told the department social worker that she did not feel comfortable in the group setting offered by one of those providers, DCF referred her for individualized services that she did not complete. While

Mr. M. was at the Bishop House halfway facility for three months after his release from incarceration, he did receive domestic violence services, and after he was back in contact with DCF, the department referred him to Radiance Innovative Services for a domestic violence assessment. He went to the intake assessment, after which Radiance recommended that he attend group treatment. Mr. M. attended one group and then stopped doing so.

Beyond physical safety, Avia also needs love, affection and nurture, stability, and permanency. Her mother's interactions with her, as reported by the DCF social worker who has supervised their visitations, show that Ms. G. can be warm, loving and responsive to her daughter. (The father has visited the child too little, so his ability to meet this need is unknown.) Despite these favorable observations about the mother's interactions with Avia, however, Ms. G.'s personal history is the source of serious reservations about her readiness to provide the child with safety, stability, permanency or to assume responsibility for this young child, in view of Avia's age and needs, when the petition was filed, on the adjudicatory date, at the end of trial or in the reasonable future. After the child had been returned to her at NLC, Ms. G. operated a motor vehicle while intoxicated and her daughter was a passenger. That incident occurred in November, 2016. After an additional year of substance abuse and mental health services, the mother again operated a motor vehicle while intoxicated or under the influence of illegal substances in November, 2017. Fortunately, the child was not in the vehicle on that latter occasion, since Avia had been removed from her mother's care and custody after the November, 2016 incident.

The record contains many examples of Ms. G. stating that she wanted to end her addiction to drugs and alcohol and that she entered numerous substance abuse treatment programs hoping to overcome her addiction. Similarly, the evidence contains examples of her stating that she recognized and wanted to eliminate the safety threat posed by her relationship with Mr. M. The evidence also, however, shows that she chose her own path toward such objectives and generally did not heed the advice or recommendations from DCF or her treatment providers. Choosing her own therapist rather than accepting DCF's referral to Wheeler Clinic has not been shown to have any negative consequences, and the evidence shows no reason to believe that her therapist is less skilled than clinicians she might have seen at Wheeler Clinic. Until recently, however, she had rejected recommendations from her substance abuse counselors to reenter inpatient treatment and insisted that she "could maintain her sobriety doing Intensive Outpatient Treatment." Petitioner's exhibit 23, Running Narrative for January 25, 2017. Moreover, she has never been willing to engage in consistent treatment or ser-

vices to help her end her relationship with Mr. M. and avoid future domestic violence. Despite the many times in which Ms. G. has asserted a desire to end drug addiction and domestic violence, she continued, at least until recently, to abuse drugs and/or alcohol and maintained her relationship with Mr. M. Because of this long history of substance abuse and domestic violence, statements she now makes about a desire to overcome her addiction or end her marriage cannot be credited until they have been corroborated by a substantial period demonstrating her success in achieving those goals.

The evidence therefore proves clearly and convincingly that, at the time the TPR petition was filed, on the amended adjudicatory date, and at the close of trial, neither parent had sufficiently rehabilitated themselves that they were ready, on any of those occasions or in the reasonable time thereafter, to assume a responsible position in Avia's life, in view of Avia's age and her needs.

In light of the mother's many relapses after treatment, any present sobriety or abstinence from drugs is too new and short-lived to offer confidence that they will continue. While several of the mother's treatment providers who testified said that relapses are a normal component of recovery from drug abuse, the court does not regard such testimony as meaning that relapses are signs of recovery. Instead, the court views such testimony as signifying that recovery from substance abuse is arduous, may not follow a steady path toward recovery, and may include setbacks. The mother's many relapses, after so many treatment opportunities, and the November, 2017 relapse in particular, show that Ms. G. will need to demonstrate a substantial period of sobriety, without relapses, before one can be confident that she is, at last, in lasting recovery.

Even after the father was incarcerated, the parents maintained their relationship, and the domestic violence between them continued through at least June of 2017, and, in light of their inability to form and maintain healthy intimate partnerships, neither of them has shown any ability to teach their child about healthy relationships and respect for others or to model such relationships to Avia. One cannot be confident that either of them yet has the ability even to provide the child with a safe environment, and the recent past suggests that the risk is too great that the mother might again drive while under the influence or the parents might again engage in violence. The mother's last-minute filing for divorce does not signify that she has learned any of the skills necessary to provide Avia with a safe, secure, and stable home, and, at best, suggests that these two parents might no longer engage in violence with each other that could endanger a child in their care, but neither one has shown that an end to this relationship would mean an end to their mutual

and long patterns of involvement in violent intimate relationships.

In sum, the petitioner proved both grounds for termination of the father's parental rights clearly and convincingly, and the sole ground alleged as to mother by that same standard of clear and convincing evidence.

### III

### DISPOSITIONAL PHASE OF TPR PROCEEDING

Having concluded that clear and convincing evidence proved the statutory grounds pleaded for termination of the respondents' parental rights to this young child, the court must next proceed to the dispositional phase, in which "there must be a showing by clear and convincing evidence whether termination is in the best interests of the child." *In re Brian T.*, 134 Conn. App. 1, 11, 38 A.3d 114 (2012). On disposition, the court may consider information through the close of the evidentiary hearing.

### A

### Statutory Factors

In making the dispositional decision in a nonconsensual TPR proceeding, the court is mandated to consider and make written findings regarding seven factors specified in § 17a-112 (k). See, e.g., *In re Tabitha P.*, 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). "The . . . factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citation omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003). As required by the statute, the court has considered the statutory factors and makes the following written findings with regard to the commissioner's petition to terminate the respondents' parental rights to this child, and the court has considered these findings in determining that terminating their parental rights is in Avia's best interest.

### 1

"The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent"—§ 17a-112 (k) (1).

The department provided timely and appropriate services, as discussed above, to facilitate the reunion of the child with each parent by making referrals to service providers to treat the mother's substance abuse and mental health issues and both parents' continuing involvement in abusive intimate relationships.

### 2

"[W]hether the Department of Children and Families has made reasonable efforts to reunite the fam-

ily pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time"—§ 17a-112 (k) (2).

As discussed above, DCF made reasonable efforts to reunite the family, as required by the federal Adoption and Safe Families Act of 1997, as amended.

3

"[T]he terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order"—§ 17a-112 (k) (3).

The following specific steps were ordered and agreed to by the mother and father:

*Keep all appointments set by or with DCF, including for mother that she cooperate with at least two home visits a month. Mother*: There was no evidence that Ms. G. missed any appointments to meet with one of the DCF social workers outside the home, but she has not complied with the request of the current DCF social worker for home visits. She also missed numerous appointments to visit with her children, did not keep at least one appointment to which she had agreed for a hair test, and did not keep all of her appointments with Harold Fischer and Associates, the domestic violence service provider to which the department referred her. *Father*: Mr. M. missed appointments to visit with Avia and at Radiance Innovative Services, the domestic violence provider to which the department referred him.

*Cooperate with DCF home visits, announced or unannounced, and visits by the child(ren)'s court-appointed attorney and/or guardian ad litem.* Ms. G. has not cooperated, as she has refused requests for home visits by DCF social workers. There was no evidence that the father has failed to comply with this step.

*Keep whereabouts known to DCF, your attorney, and child's attorney. Mother*: After her discharge from the NLC program in November, 2016, the mother did not inform DCF of her whereabouts for several months. *Father*: After his release from incarceration, he also failed to keep his whereabouts known to DCF for several months. There was no evidence whether either respondent also failed to keep their whereabouts known to their attorney or the child's lawyer.

*Take part in counseling to and make progress toward the identified treatment goals*: As discussed above, neither parent has complied with this step. Although Ms. G. has participated in substance abuse, mental health, and domestic violence counseling, the evidence shows no progress toward meeting the goals identified for that treatment, except that she does appear to be able to maintain a close and nurturing relationship with Avia during visits. Similarly, Mr. M. has shown no progress in learning how to avoid domestic

violence despite his limited participation in domestic violence treatment services to which DCF referred him.

*Cooperate with recommended service providers*:[35] *Mother*: The testimony and exhibits presented at trial suggest that, when undergoing treatment, Ms. G. may sometimes present the appearance of making sincere and earnest effort to cooperate with her substance abuse and mental health service providers. For example, the exhibits from treatment providers sometimes (but not always) contain what appear to be candid admissions from her about her substance abuse history and her explanations for her repeated relapses. As noted in the text above, however, she is not always honest with her treatment providers, and some of those records indicate a tendency on her part to blame others for her problems rather than accepting personal responsibility for the choices she has made. Regardless of the apparent candor of her statements to her treatment providers and her sometimes ostensible cooperation with them, however, her cooperation has never extended to complying with the ultimate goals of treatment that she stop abusing drugs and alcohol and stop involving herself in violent relationships. Her decisions near the time of trial to reenter an inpatient treatment program and to file for divorce may signal a willingness now to cooperate more fully with the recommendations of treatment providers, but not enough time had elapsed at trial's end to determine whether any such willingness continues. She has also shown only limited cooperation with the service provider through The Connection that sponsors and provides her with Supportive Housing, and she has received three warnings for noncompliance with that program. *Father*: Mr. M. did not comply and stopped attending the domestic violence program.

*Submit to substance abuse evaluation and follow treatment recommendations; submit to random drug testing; do not use illegal drugs or abuse alcohol or medicine.* Until recently, Ms. G. had not followed treatment recommendations for a higher level of drug treatment. She still has not complied with the department's repeated requests for hair samples for drug testing, and she has continued, at least until recently, to use illegal drugs and to abuse alcohol. Mr. M. did comply with DCF's referral for a substance abuse and mental health evaluation.

*Sign releases allowing DCF to communicate with the parents' service providers and your child's attorney to review your child's records.* Ms. G. has signed many but not all of the releases requested by the DCF social worker. There was no evidence that father failed to comply with this step.

*Cooperate with court-ordered evaluations.* No evaluations were ordered.

*Get and/or maintain adequate housing and legal*

*income.* Ms. G. has partly complied. She has lived in adequate subsidized housing funded through The Connection, but has been at risk of losing the subsidy by not fully complying with the program's requirements. She has had no source of legal income, and has not yet completed the vocational training program for a CNA certificate that would probably provide a means by which she could support herself. There was no evidence about father's compliance with this step, other than his report of being employed.

*Identify changes in household composition.* There was no evidence that either parent failed to comply with this step.

*Take care of children's various needs and make all necessary child care arrangements*: While Avia was placed with her at the NLC program, Ms. G. satisfactorily took care of her various needs until she risked the child's life and safety by driving in an intoxicated condition while Avia was in the motor vehicle.

*No involvement in the criminal justice system. Comply with probation or parole.* Neither parent has complied, as both have been arrested for new offenses.

*Visit child(ren) as often as DCF permits.* Neither parent complied, as both have missed numerous visits.

*Supply names and addresses of grandparents and of persons the parent would like DCF to consider as a placement resource.* There was no evidence that either parent failed to comply with this step.

4

"[T]he feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties"—§ 17a-112 (k) (4).

Avia spent the first three months of her life in foster care, then lived with her mother at the NLC mother-daughter program for approximately four months, and after that returned to the same foster home where she had lived earlier. She has remained in that foster home for more than 14 months since then. Avia is closely bonded and very affectionate with her foster mother and father, with whom she has spent most of her life. She looks to them for comfort and is also bonded with her foster siblings.

The evidence shows that Ms. G. and Avia have an affectionate relationship and that Avia has developed a bond with her. But Avia is confused about who her mother is, as she also calls her foster mother "mommy." When Ms. G. says, "Come to mommy," during those visits, Avia does not always respond.

Avia has seen her father, Mr. M., only a few times in

her life. He refused any visits with her while he was incarcerated. After he was placed at the halfway house, he agreed to visitation and saw her four times before his release from Bishop House in March, 2017. He then had only two more visits with her, in October and December, 2017. Under these circumstances, in view of her age, she could not have feelings or emotional ties for him other than a possible recognition of him as an occasional visitor.

5

"[T]he age of the child"—§ 17a-112 (k) (5).

Born on March 31, 2016, Avia was twenty-one months old at the end of trial. She has now just turned two years old.

6

"[T]he efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child"—§ 17a-112 (k) (6).

By repeatedly engaging in substance abuse treatment and entering mental health counseling, Ms. G. sometimes appeared to make sincere but unsuccessful efforts to "adjust [her] circumstances, conduct, or conditions to make it in the best interest of the child to return [the child to her] home in the foreseeable future . . . ." As discussed above, however, her actual sincerity or willingness to benefit from treatment is difficult to discern, as she has not always been honest with her treatment providers. She has not accepted all of the opportunities offered to her to maintain and develop her bond and relationship with Avia, however. She has missed almost one-quarter of the visits offered recently, and has not kept in telephone contact with the child that had been offered by the foster mother.

The father, Antonio M., has only marginally taken actions to "adjust [his] circumstances, conduct, or conditions to make it in the best interest of the child to return [the child to his] home in the foreseeable future . . . ." He refused any visits with the child while he was incarcerated, did not contact the department for several months after his release from incarceration so that visits in the community could begin, and then did not attend some of the visits with the child offered by DCF after that. He has thus not visited with the child as often as he could have and not benefited from the services that are a prerequisite to reunification.

7

"[T]he extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent"—§ 17a-112 (k) (7).

Other than the parents' participation in incidents of domestic violence and continuing their relationship, there is no evidence that any unreasonable act on the part of either parent or any other person prevented either one from maintaining a meaningful relationship with the child, or that the economic circumstances of either parent had such an effect.

## B

### Best Interest of the Child

The final element of the termination of the parental rights statute, § 17a-112 (j), requires that, before granting a petition for such termination, the court must find "by clear and convincing evidence that . . . (2) termination is in the best interest of the child . . . ." The best interest standard is inherently flexible and fact-specific to each child, giving the court broad discretion to consider all the different and individualized factors that might affect a specific child's welfare. In determining that terminating the respondents' parental rights is in the best interest of this child, the court has considered various factors, including her interest "in sustained growth, development, well-being, and in the continuity and stability of [her] environment"; *Cappetta* v. *Cappetta*, 196 Conn. 10, 16, 490 A.2d 996 (1985); her age and needs; the length and nature of her stays in foster care; the contact Avia has had with her mother and father since removal; the potential benefit or detriment of her retaining a connection with her biological parents; her genetic bonds to her parents; *In re Savanna M.*, 55 Conn. App. 807, 816, 740 A.2d 484 (1999); and the seven statutory factors and the court's findings thereon. The court has also balanced Avia's intrinsic need for stability and permanency against the potential benefit of maintaining a connection with her biological parents. See *Pamela B.* v. *Ment*, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity).

The evidence proved clearly and convincingly that terminating the parental rights of both respondents is in this child's best interest. The father has shown a distinct lack of interest in Avia or in addressing the problems of criminality and domestic violence that pose a threat to her safety. The mother has a long history of substance abuse that has jeopardized the safety and well-being of her children on more than one occasion and a similarly long history of exposing both of her children to the inherent dangers of adult intimate partner violence. She has used drugs or abused alcohol

while under protective supervision, while pregnant, and while engaged in treatment. Since Avia was born, Ms. G. has sought substance abuse treatment on at least six different occasions—residency at the New Life Center between April and November, 2016, intensive outpatient treatment at Wheeler Clinic, Community Mental Health Affiliates and, for two different periods, Farrell Treatment Center between January and November, 2017, at the Milestone inpatient treatment program from late November, 2011, to late December, 2017, and lastly, outpatient treatment once again at the Farrell Treatment Center. None of the previous substance abuse treatment before her recent stay at the Milestone facility had enabled her to overcome her addiction. Any recent success is too new and short in duration to provide any basis for assessing the likelihood of continued sobriety, and only a substantial period of sobriety from drugs or alcohol will provide any confidence that the cycle of relapses has ended. In addition, filing to dissolve her marriage to Mr. M. may signal a desire on Ms. G.'s part to end her relationship with him, but nothing has shown that she will not choose another partner with the same violent proclivities as the fathers of her two children.

As our Supreme Court has noted, "the best interests of the child are usually served by keeping the child in the home with his or her parents." *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 285, 455 A.2d 1313 (1983). It was necessary, however, to remove Avia from her mother's care, however, for her own safety, which that court has recognized as one of a child's two fundamental interests: "The child . . . has two distinct and often contradictory interests. The first is a basic interest in safety; the second is the important interest . . . in having a stable family environment." (Emphasis omitted.) Id., 287. Avia is young, vulnerable, and completely dependent on others to keep her safe. Neither this child's mother nor her father offers the prospect of being able to provide her a safe home today or in the foreseeable future. She also needs a stable and permanent home with caretakers who will not only meet her basic needs for food, shelter, medical care, and the necessities of life, but whose nurture will guide her development as a child and adolescent so that she forms healthy values and grows into a well-adjusted member of our society. Unfortunately, the clear and convincing evidence proves that neither parent is ready to meet her needs for such a caretaker either today or in the reasonable and foreseeable future.

Our courts have "noted consistently the importance of permanency in children's lives." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 494, 940 A.2d 733 (2008), citing *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 646, 436 A.2d 290 (1980). They have similarly observed that "[s]table and continuous care givers are important to normal child development. Children need secure and uninterrupted emotional rela-

tionships with the adults who are responsible for their care." (Internal quotation marks omitted.) *In re Davonta V.*, supra, 494–95. "[L]ong-term stability is critical to a child's future health and development . . . ." (Citation omitted.) *In re Eden F.*, supra, 250 Conn. 709. "Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 285.

This child's best interest lies in having a safe, stable and permanent home. Her mother requires much time to show that she has forsaken substance abuse and ended her long history of living in a violent home environment. Her father has shown no interest in providing her with the home she needs and addressing his history of violence in the home. Under these circumstances, the child's needs for safety, stability and permanency cannot wait for the uncertainty of her parents' rehabilitation. Thus it was proven clearly and convincingly that it is in her best interest to terminate the parental rights of the two respondents in order to offer this child the prospect of stability and permanency in an adoptive home.

## IV

## ORDERS OF TERMINATION

The court having considered all the statutory criteria, having found by clear and convincing evidence that grounds exist for the termination of the parental rights of both respondents, and having further found by clear and convincing evidence, upon consideration of all of the facts and circumstances presented, that it is in the best interest of this child to terminate the parental rights of the two respondent parents, it is hereby ORDERED:

The commissioner's petition for termination of the parental rights of the respondent mother and father are granted, and judgment may enter terminating the parental rights of Agnieszka G. and Antonio M. to Avia.

Pursuant to § 17a-112 (m), it is ordered that the Commissioner of Children and Families is appointed statutory parent for the child so that she may be placed for adoption.

Pursuant to § 17a-112 (o) and Practice Book § 35a-14 (h), the statutory parent shall file a written report on the case plan, the permanency plans, and the status of the child with the clerk of the Superior Court for Juvenile Matters at New Britain on or before May 3, 2018, at 9:00 a.m., and every three months thereafter on implementation of the plans.

---

* Affirmed. *In re Avia M.*, 188 Conn. App.    ,    A.3d    (2019).

[1] At the close of trial, Avia was twenty-one months old.

[2] Practice Book § 35a-8 (a) provides in pertinent part that "[a]ll parties except the child or youth shall be present at trial unless excused for good cause shown. Failure of any party to appear in person or by their statutorily permitted designee may result in a default or nonsuit for failure to appear

for trial, as the case may be, and evidence may be introduced and judgment rendered."

[3] The lists of witnesses and exhibits in the text following this note summarizes and discusses some, but not all, of the portions of that evidence that was found credible and was relied upon by the court in its findings and conclusions.

[4] Testimony from social worker Orvis about the mother's positive results for cocaine and marijuana at Avia's birth was not admitted for truth but to explain the reasons for the ensuing DCF investigation that led to the removal of the child and her maternal sibling on orders of temporary custody (OTC) and the filing of neglect petitions. Such evidence was admitted without limitation or qualification, however, in other exhibits.

[5] It was not clear from the evidence exactly when Ms. G. completed the Milestone Program. Her treatment counselor there testified that she was at Milestone until approximately December 27, 2016, and her case manager from The Connection testified that she was released from the facility on December 26, 2017. See transcript of testimony of Lori Bergeron on January 9, 2018, p. 78; transcript of testimony of Diane Gediman on January 8, 2018, p. 113. Records from the CHR Milestone facility, however, describe the "end date" for her treatment there as January 3, 2018. Respondent mother's exhibit C, first page. These differences have no evidentiary significance.

[6] Petitioner's exhibit 18 contains five documents from The Connection entitled "DCF Monthly Client Contact Report," for the period from October, 2016 through February, 2017, and electronically signed by Diane Gediman, the case manager for The Connection's Supportive Housing Program. When introducing this exhibit into evidence, the assistant attorney general erroneously referred to it as "the CMHA reports from October, 2016, to March, 2017." Transcript, January 17, 2018. (Petitioner's exhibit 7 contains these same reports for the period from March, 2017 through December, 2017). No documents from CMHA for the period from October, 2016 through February, 2017, were ever introduced into evidence.

[7] The police report regarding that incident states, in pertinent part, as follows: "SUMMARY: ANTONIO was arrested for violating [General Statutes §] 53a-223 Violation of Protection Order. [M] was found hiding under a blanket at the above location where his girlfriend AGNIESZKA [G.] resides. There is an active protective order between AGNIESZKA and [M]. [G] is listed as the protectee on the order . . . which states that there is to be no contact between them and [M] is not to enter the home of AGNIESZKA." Case/Incident Report # 15-7389, dated March 30, 2015, contained in petitioner's exhibit 8.

[8] The police report regarding that incident states, in pertinent part, as follows: "An NCIC check showed Antonio having an active Protective Order with Victim 1 [Ms. G.] as the protectee. The Protective Order stipulation is CT 01. CT 01 states do not assault, threaten, harass, interfere with. Antonio violated this order by striking Victim 1." Case/Incident Report # 15-26709, dated December 6, 2015, contained in petitioner's exhibit 8.

[9] The quotations are all from the New Britain Police Department case incident report for the dates specified and were contained in petitioner's exhibit 8.

[10] "Client presented with cocaine use disorder, severe and cannabis use disorder, mild at time of admission. She reported she uses cocaine by method of inhalation and that she would typically use daily in the amount of $40-$100 worth." Petitioner's exhibit 17, p. 1.

[11] "Client first began using substances with alcohol at age 15. It was a problem before her cocaine use but it decreased after she began using cocaine. . . . Client began using cocaine by inhalation at age 28. She uses $40-100 worth daily." Respondent mother's exhibit C, p. 12.

[12] "Q. . . . And she reported using forty to a hundred dollars worth of cocaine daily?

"A. That's correct." Testimony of L. Bergeron, transcript of proceedings, January 9, 2018, p. 83.

[13] The TPR social study and the Investigation Protocol introduced into evidence credibly recounted that history. On January 31, 2005, when Aaliya was less than seven months old, the mother and Aaliya's father returned home intoxicated and engaged in a physical altercation in front of Aaliya. Six months later, on June 29, 2005, Ms. G. came home intoxicated and then punched and bit the maternal grandmother. On June 27, 2007, the maternal grandmother "picked the daughter up at daycare without mother's permission because mother was intoxicated. . . . Mother and grandmother argued and mother tried to grab her daughter from grandmother's arms. Mother

scratched daughter on her left arm and left cheek. Caller [Farmington Police Department] stated they are very small." Petitioner's exhibit 22, p. 5. On May 26, 2010, the child reported that Ms. G. "drank wine all the time, and that she never washed clothes nor cooked food. Aaliya reported the house was a mess, and she wished it would be clean." Petitioner's exhibit 1, TPR social study dated April 24, 2017. In July, 2012, Aaliya called 911 to report that her mother was " 'stumbling and fainted to the ground' and could not be roused." Id., 2–3. The mother was then tested positive for marijuana, cocaine, and PCP.

[14] In March, 2014, Ms. G. reported to the New Britain Police Department that Mr. M. assaulted her in Aaliya's presence. On February 20, 2015, the respondent parents had an argument at the mother's home in which Mr. M. "accused her of cheating on him." New Britain Case/Incident Report dated February 20, 2015, p. 2, contained in petitioner's exhibit 8. Mr. M. pushed Ms. G. onto her bed and wrapped his hands around her neck. Aaliya heard them arguing and Mr. M. calling her mother "bad names." Id. The child went into the bedroom and saw Mr. M. "[o]n top of her mother pinning her down on the bed." Id. The child yelled for him to stop and he then kicked a lamp and punched a hole in the wall.

[15] A fuller recital of the direct examination of social worker Orvis portrays this incident even more vividly:

"Q. Okay. You said that you were never able to get into the home, did you ever have face-to-face contact with her?

"A. There—there was a time where I was pretty adamant on ensuring the safety of the child and I arrived when Aaliya would be getting home from school and I did try my very best to get Ms. [G.'s] attention at which point I ran up the stairs and she closed the door on me and I went back to my car. And I kept leaving notes. I would talk to her outside the door and I went back to my car. Ms. [G.] lifted up the window and said, nice try, try again. So she clearly did not, you know, want to speak with me." Transcript of testimony, January 8, 2018, p. 129.

[16] The mother appeared at a subsequent hearing and was appointed an attorney, who did not seek to open the default judgment. See Memorandum of Hearing dated October 21, 2015, in *In re Aaliya S.*, Docket No. H14-CP15-011525-A.

[17] Under General Statutes § 17a-28, all records maintained by DCF are confidential and may only be disclosed with the consent of the individual who is the subject of the records or as authorized by the statute. That statute provides, in pertinent part, as follows: "(b) . . . [R]ecords maintained by the department shall be confidential and shall not be disclosed, unless the department receives written consent from the person or as provided in this section, section 17a-101g or section 17a-101k. . . ."

[18] The fathers of the two children were not available to assume care of the children. Aaliya's father had returned to his native country of Poland in 2005, and Avia's father was incarcerated.

[19] The following was elicited by the assistant attorney general on direct examination of Ms. Larkin:

"Q. With respect to Ms. G. . . . her initial assessment, what did that reveal about the issues that brought her to New Life?

"A. So it was obvious that she had an addiction history and she was struggling with substances at that—at time of admission. There was also mental health issues that, you know, we wanted to make sure were addressed. I think those were probably the two biggest issues. But she had also voiced wanting to work on, you know, healthy relationships as well, which was something that we worked on throughout the program, as well as parenting and working to reunify her with her daughter when she was in the program.

"Q. Okay. So the program included mental health, substance abuse, domestic violence or intimate partner violence and parenting components?

"A. Yeah. . . .

* * *

"Q. And you mentioned domestic violence, why was that an issue?

"A. [Agnieszka G.] had mentioned a lot during our treatment that she had a history of some abusive relationships and that, you know, she wanted to work on having healthier relationships in the future." Transcript of testimony, January 17, 2018, pp. 41–43.

[20] Within a few days after this incident, Ms. G. had a telephone conversation, recorded by DOC, with the respondent father about what had happened. The briefs filed by both the petitioner and the minor child correctly note her failure in those conversations to acknowledge that she had endangered

her child's life and safety.

[21] Samantha Larkin's fuller description of NLC's position after Ms. G.'s relapse is described below:

"She had admitted to drinking while she was out on pass. We had discussed the situation that happened. We kind of processed her thoughts, you know, the events, her actions, the choices, and kind of just processed the whole situation as part of her treatment.

\* \* \*

"So we had to subsequently file the [form] 136 with DCF. We were fully intending on planning on working with her. She remained in the program following that. And like I said, we wanted to work to kind of process that relapse and, you know, get her back on track where she needed to be.

"As a result of the 136, DCF did come and remove the child from her care at New Life Center on a 96 hour hold and I believe that was the 8th of November and she remained in the program. And we, you know, like I said, we wanted to continue to work with her. We didn't want her to discharge from the program and end up in the community unsafe.

\* \* \*

"I mean, I definitely wanted her to stay. I wanted her to stay and make sure that she was stable because the choice to leave, in my opinion, was impulsive. She had told me that she had thought the process through, but she didn't have housing at that point. She was working on a discharge plan.

"I just wanted to make sure that she had a secure aftercare plan in place prior to her leaving the program, especially considering the removal of her child recently and there was some obvious events that had taken place that I wanted to make sure that she was in a stable place before she left the program." Transcript of testimony, January 8, 2018, pp. 52–55.

[22] Examples include the following:

- "I got drunk and relapsed. . . . I felt alone and vulnerable and so mad. . . . I'm so tired of being alone." Telephone call with respondent father on November 9, 2016, contained on petitioner's exhibit 29, DVD recording of father's telephone calls while incarcerated.

- She told a DCF social worker on January 20, 2017 that "she relapsed on cocaine . . . . Mo stated that she messed up and it's because of Mr. M. on facebook. Mo is blaming fa for her relapsing. Mo reported seeing fa on facebook and being upset with his posts." Petitioner's exhibit 23, Running Narrative for January 20, 2017.

- At the IOP Intake at CMHA on March 9, 2017, she "shared that she usually engages in substance abuse due to inability to cope with emotional pain from trauma hx, as well as struggling to cope with chronic back pain." Petitioner's exhibit 31, p. 1.

- "Client . . . disclosed that she has been using and has decided to go into rehab. Client stated that her abusive husband has been her trigger and she has had some contact with him. Client stated ever since he got out of jail, she has been relapsing in response to his emotional and verbal abuse of client." Respondent mother's exhibit B, The Connection Client Chronological Notes, unspecified date, p. 27.

- "Client's Presenting Problem . . . . 'My drug of choice is cocaine and I first started using it when I was 28. I was going through a break up and it filled that void. It escalated in 2014. I had just gotten married and my husband started using too. When my husband became abusive, I started drowning myself into it.'" Petitioner's exhibit 27, CHR Intake, November 29, 2017, p. 1.

- "Substance Abuse Summary . . . . 'When I feel depressed or anxious or have low energy it makes me want to use. . . . Relapsed because stress from husband's abuse. Has had shorter periods of sobriety and states she relapsed due to loneliness, isolation, husband's abuse.'" Id., p. 6.

- "Client said she will often use when people verbally abuse her or she feels alone. . . . Client spoke about her husband's verbal abuse and it often making her want to use. We began discussing her getting back with her x husband after he got out of jail for domestic abuse. She said she left New Life in November and started talking to him again in December. She said he told her things would be different and she was hoping he had changed. Client said she owed it to herself to give him another chance. Client said he pretty quickly became verbally and emo-

tionally abusive with her again. He also used and she used with him. Client said he would call her names and she lost her self esteem again when she was with him. She said she felt ugly and hopeless and he would call her a whore and tell her she was worthless and that nobody would want her. Client said she didn't know how to climb out and felt alone again like when she was a kid. She said she was always the bad egg, the loser and never good enough. Client said the only friend she had was cocaine." Respondent mother's exhibit C, CHR records, Counseling on December 10, 2017, p. 1.

[23] The court draws no adverse inference against the mother for selecting her own therapist rather than attending the counseling service recommended by DCF. What is important is whether she attended therapy, which the evidence shows she did, and whether she made progress toward the goals for therapy set by the specific steps, a subject discussed in the text.

[24] The notes maintained by the mother's therapist, Ronald Klemba, contain the following annotations regarding their treatment sessions:

"2/22/[17] Client very tearful upset and reporting sobriety too painful to feel."

"3/7/[17] Client admits to back and forth continued drug use. Cannot see life without getting high."

"4/4/17 . . . . Suppresses a need for help while dictating type of help acceptable. Refuses to be redirected at this point."

"6/6/[17] Demanding this be over and kids returned. Client in a very demanding mood not looking at her own decisions that made the current state nec."

"6/13/17 Client promising to go inpatient once achieving CNA certificate. A pattern of procrastination affecting the outcome of case."

"6/27/17 Client ask for excuse support now using mental health as excuse for inconsistent with programs."

"7/18/17 Still trying to dictate programs + progress. Refusing redirection as she gets 'too down.' "

"8/8/17 Client unwilling to address concerns related to [children's] commitment to DCF as she claims to have it covered."

"9/12/17 Convinced if she does well in rehab she will regain her children. Does not want reality check as addiction takes lots of time."

"9/19/17 Client cannot accept the possibilities and prefers to live in denial. Re committing to beating addiction."

"11/1/17 Many loose ends to take care of before the inpatient program. Client seems motivated to stay with current plan instead of historic flips."

"1/11/2018 . . . . Client calm fresh out of rehab committed to sobriety . . . . New goals being generated new commitment towards them . . . . Progress [check mark on line next to 'Unchanged']." Excerpts from Psychotherapy Treatment Records, contained in respondent mother's exhibit F.

[25] Ms. G. introduced a 21 page exhibit into evidence that was entitled "Participant Profile" from the Prudence Crandall Center. Since there was no witness testimony explaining that exhibit, however, some of the entries were difficult to understand fully.

[26] The Prudence Crandall [Center] Participant Profile contains entries dated July 15, 2014, stating "Phone attempt 11:18am . . . person unavailable" and September 9, 2014, stating "Attempt phone contac [sic] with victim. Person unavailable and the v/m [which the court construes as an abbreviation for 'voice mail'] is not set up." Respondent mother's exhibit E, pp. 8 and 9.

[27] A "contact note" regarding "counseling" that she received in person on October 12, 2017, states as follows: "Still involved with her husband, but states she has filed for divorce." Respondent mother's exhibit E, p. 7. This most recent entry in that exhibit does not provide any explanation for the apparent contradiction between "still involved" and "filed for divorce" and suggests that the filing for a dissolution did not signify an end to their relationship.

[28] The petitioner introduced evidence showing that on August 17, 2017, the mother complained to police that the father had snuck into her home late at night, attacked and started hitting her, held her down by the hair, dragged her out of bed by the hair, and punched and kicked her repeatedly. The police officer assigned to investigate the alleged incident determined that the mother's report was improbable and not credible; and his testimony as to his reasons for that conclusion was credible. Hospital records of her visit to the emergency room do not undermine the officer's conclusion. The court accordingly does not find it proven that Mr. M. engaged in any act of violence against Ms. G. that evening. It is more likely that she fabricated her account.

[29] The trial brief of the respondent mother argues that the "highly probably true" articulation of the clear and convincing standard often expressed by

Connecticut courts does not comport with the due process clause of the fourteenth amendment of the United States constitution. See Trial Brief for Respondent Mother, pp. 18–19. It is true that Connecticut cases often describe the clear and convincing standard in the following way: "The burden of persuasion, therefore, in those cases requiring a showing of clear and convincing proof is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." *Dacey* v. *Connecticut Bar Assn.*, 170 Conn. 520, 537, 368 A.2d 125 (1976); see also *Lopinto* v. *Haines*, 185 Conn. 527, 534, 441 A.2d 151 (1981) (same). Her brief is also correct that the clear and convincing standard of proof is constitutionally required under the due process clause of the fourteenth amendment in TPR cases. See *Santosky* v. *Kramer*, 455 U.S. 745, 756, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Finally, her brief is correct that the United States Supreme Court has approvingly quoted a New Jersey case describing that standard as evidence which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." (Internal quotation marks omitted.) *Cruzan* v. *Director, Missouri Dept. of Health*, 497 U.S. 261, 285 n.11, 110 S. Ct. 2841, 111 L. Ed. 2d 224 (1990), citing *In re Jobes*, 108 N.J. 394, 407–408, 529 A.2d 434 (1987). In that same case, however, the Supreme Court also approvingly quoted a New York case formulating a different description of clear and convincing evidence: "The clear and convincing standard of proof has been variously defined in this context as 'proof sufficient to persuade the trier of fact that the patient held a firm and settled commitment to the termination of life supports under the circumstances like those presented' . . . ." (Citation omitted.) *Cruzan* v. *Director, Missouri Dept. of Health*, supra, 285 n.11, citing *In re Westchester County Medical Center*, 72 N.Y.2d 517, 531, 531 N.E.2d 607, 534 N.Y.S.2d 886 (1988).

In this case, the evidence sustaining the petitioner's case with regard to reasonable efforts, the adjudicatory grounds for termination, and the best interest of the child satisfies all three of these formulations of the clear and convincing standard.

[30] The court in that case also noted that "the court was not under an obligation to consider events after the filing of the termination petitions in the adjudicatory phase of the proceedings . . . ." *In re Jennifer W.*, supra, 75 Conn. App. 496–97.

[31] The court in that case also noted that "[o]ur rules of practice and the relevant statutory provisions do not . . . address whether the trial court should consider evidence of events following the filing of the petition for termination of parental rights when determining whether the department has made reasonable efforts." *In re Oreoluwa O.*, supra, 321 Conn. 543. Although the facts of all TPR cases are different, those in *In re Oreoluwa O.* were highly unusual. The respondent father lived in Nigeria and "was having difficulty traveling to this country to be with Oreoluwa . . . ." Id. In addition, "a review of the department's efforts to reunify the respondent with Oreoluwa demonstrates that all of those efforts were based on the department's presumption that the respondent would have to be present in this country to engage in reunification efforts and that Oreoluwa could not travel to Nigeria." Id., 542. When the TPR petition had been filed, "there was uncertainty as to when Oreoluwa would be cleared to travel and his medical status was in a state of flux." Id., 543–44. In determining that the department had made reasonable efforts to reunify, the trial court had relied on departmental assertions that "[t]here is also uncertainty regarding the medical care [Oreoluwa] would be able to receive in Nigeria and if his ongoing medical needs would be able to be met" without any evidence that the department had actually "attempted to investigate what type of medical care Oreoluwa would receive in Nigeria." (Internal quotation marks omitted.) Id., 544. The Supreme Court concluded that "[w]ithout updated medical information regarding Oreoluwa's ability to travel and medical needs . . . we conclude that the commissioner did not meet the burden of demonstrating that the department did 'everything reasonable' under the circumstances to reunite the respondent with Oreoluwa." Id., 546. The Supreme Court thus held that "[u]nder the facts of the present case, however, we conclude that it was not improper for the trial court to consider events subsequent to the filing of the petition for termination of parental rights." Id., 543.

Since then, however, two appellate opinions have reaffirmed that the reason-

able efforts determination is part of the adjudicatory phase of the proceeding; *In re Elijah G.-R.*, 167 Conn. App. 1, 32, 142 A.3d 482 (2016), and *In re Elijah C.*, 326 Conn. 480, 500, 165 A.3d 1149 (2017); and, hence, would be appropriately measured as of the adjudicatory date. The authors of the annotated practice book may therefore be correct that *In re Oreoluwa O.* is "limit[ed] . . . to the facts of the case," which they describe as "unique." B. Levesque & D. Hrelic, 1A Connecticut Practice Series: Juvenile Law (2017–2018 Ed.) § 35a-7, commentary.

From this case and *In re Jennifer W.*, supra, 75 Conn. App. 495, however, it thus appears that a court may, in appropriate circumstances, measure various adjudicatory findings, including rehabilitative status and reasonable efforts, by events occurring after the adjudicatory date. In this case, since the petition was amended to add more factual allegations, the first day of trial is the adjudicatory date, and any change in law occasioned by *In re Oreoluwa O.* is of no import here.

[32] She told staff at the New Life Center about "her history of abusive relationships and her [domestic violence] history with her husband, whom she identified as toxic." Petitioner's exhibit 5, p. 8 of 17. She reported "physical and emotional abuse from her husband" to NLC and "identified that the abuse escalated her cocaine use, as she was attempting to self-medicate and numb herself emotionally." Petitioner's exhibit 17, p. 8. She told DCF social worker Orvis on January 20, 2017, that she was "blaming fa for her relapsing." Petitioner's exhibit 23.

[33] General Statutes § 17a-112 provides in pertinent part as follows: "(j) The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . [or] (E) the parent of a child under the age of seven years who is neglected, abused or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families . . . ."

[34] The court need not consider whether the logic of *In re Elvin G.*, supra, 310 Conn. 503, requiring the prior issuance of specific steps for TPR petitions brought under subparagraph (B) (i) of § 17a-112 (j) (3) also applies to petitions brought under subparagraph (E) since the evidence proved clearly and convincingly here that the respondent father was issued such orders.

[35] For the mother, the specific steps ordered on April 8, April 15, and July 28, 2016, identified the following service providers: "30 day inpatient program; women's and children's substance abuse program; VOCA services to address domestic violence concerns, mental health provider—[W]heeler [C]linic or an equivalent program." Although Ms. G. chose to seek treatment from Ron Klemba instead of attending Wheeler Clinic, nothing in the evidence suggests that he did not offer equivalent services.

For the father, the specific steps also stated, with respect to this step: "as provided in prison or equivalent program upon release from prison."

---